IN RE JJO

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO.  2-02-382-CV

IN THE INTEREST OF J.J.O. 

------------

FROM THE 323rd DISTRICT COURT OF TARRANT COUNTY

------------

OPINION

------------

Appellant C.O., appeals from the trial court’s order terminating her parental rights to her daughter J.J.O.  In two points, Appellant challenges the legal and factual sufficiency of the evidence to support the termination of her parental rights.  We affirm.

I.  Factual and Procedural Background

This case was tried to the bench on October 7, 2002.  The evidence showed that the Texas Department of Protective and Regulatory Services (TDPRS)
(footnote: 1) first became involved with J.J.O. on January 28, 2002.  On that date, the Arlington Police Department received a 911 call that a baby was crying in a room at a Days Inn and appeared to be unattended.  Police arrived and obtained a key to Appellant’s room.
(footnote: 2)  Officer Neil Tarrant testified that the room was “completely blacked out” and that he found nineteen-month-old J.J.O. lying on the floor in a blanket.  

When Appellant returned to the hotel around 10:10 p.m., she was arrested on charges of abandonment and endangering a child for leaving J.J.O. alone for two to three hours.
(footnote: 3)  Officer Tarrant testified that, at the time of her arrest, Appellant did not seem concerned about the welfare of J.J.O., but instead only wanted to know whether she was being arrested for a felony.  During trial, however, Appellant admitted that leaving J.J.O. alone was not a good decision.  Because Appellant was taken to jail, J.J.O. was placed in a foster home. 

The next day, Child Protective Services (CPS) investigator Jill Johnson visited Appellant in jail and questioned her about allegations of neglectful supervision.  According to Johnson, Appellant gave three inconsistent stories as to why she left J.J.O. unsupervised in the hotel room.  In Appellant’s third story, which Johnson testified she believed, Appellant said she left the hotel room around seven o’clock p.m. with a friend named Curtis in a red truck.  Appellant told Johnson that she asked Curtis to give her a ride to Pancho’s but that he could not help her out.  Appellant then walked to Pancho’s, but she arrived after it closed.  She told Johnson that she walked back to the hotel to get food from Wendy’s, which was inside the hotel.   

Appellant testified that all three stories were the same story and that she just gave different details.  According to Appellant’s testimony at trial, she asked Curtis for a ride around 8:20, which he refused, and then walked to Pancho’s.  Appellant further testified that, because she arrived at Pancho’s after nine, the restaurant was closed.  Appellant stated that she went inside an open “exit door” and made a phone call.  Appellant said she had called another friend; however, she could not remember why she made the phone call. Appellant testified that she took a taxi back to the Days Inn. 

Johnson testified that she was concerned about the inconsistencies in Appellant’s stories and Appellant’s lack of care for her child.  Johnson also stated that she was concerned because of Appellant’s criminal history.  Johnson questioned Appellant about her use and possession of controlled substances and Appellant’s prior arrest for prostitution.  While Appellant told Johnson that she was not using drugs at that time, she admitted that she smoked and drank occasionally and that she had been caught offering oral sex to an undercover police officer.  Appellant admitted during trial that she was arrested for prostitution in September 1999, which was roughly nine months before J.J.O. was born on May 31, 2000.  Appellant initially named Jesse Anderson as J.J.O.’s father, but she later stated that she did not know the identity of J.J.O.’s father.  

As a result of the investigation, on January 30, 2002, TDPRS filed a petition for protection of J.J.O., for conservatorship, and for termination of Appellant’s parental rights.  On February 2, 2002, Dawn Adkins, who is an ongoing caseworker for CPS, was assigned J.J.O.’s case.  Adkins testified that in March 2002 TDPRS drew up service plans for Appellant with the goal of reuniting her with J.J.O.  Appellant’s service plan was intended to stabilize her lifestyle by requiring that she obtain housing, maintain a job, participate in counseling and parenting classes, and undergo a psychological evaluation.  Adkins worked with Appellant from February until her trial and testified about Appellant’s lifestyle and her efforts to comply with her service plan.  

At the time of her trial, Appellant was several months pregnant with her second child.  Appellant testified that Julio Herrera was the father of the second child and that they had been in a relationship from April to June of 2002, when she lost contact with him.  Appellant testified that Herrera moved to Laredo, Texas and that he did not know she was pregnant with his child.
(footnote: 4) 

Adkins testified that when she met Appellant, Appellant was working at K-Mart and at a dentist’s office as a dental assistant.  She worked both jobs until she quit both of them in April 2002.  When Adkins asked Appellant how she was supporting herself, Appellant said that her friends gave her money.  During trial, Appellant testified that she had been unemployed since April but had a job “starting tomorrow” at Boston Market.  

Adkins also testified that Appellant never maintained a stable address. Appellant likewise testified that she had a hard time finding a place to live.  After being released from jail in January, she stayed with Dennis Johnson until he “got promoted and . . . moved to a house.”  She then lived with a friend named Al Davis at 3232 East Abrams for “about a week or so.”  Appellant testified, “Since then, I’ve been just about everywhere.”  

She testified that she stayed in different friends’ apartments and in hotel rooms, but that she never stayed in a hotel more than one night.  Appellant first testified that she paid for the hotel rooms herself.  When asked where she got the money, Appellant answered, “The baby’s father used to give me money.” Appellant then clarified that she was referring to Herrera.  TDPRS asked Appellant how she had any money after she lost contact with Herrera in June, and she stated that she had been saving some of the money he gave to her and that she sold his car.  Appellant testified that she ran out of money in September 2002.  Appellant testified that, at the time of trial, she had found affordable housing with CPS’s assistance. 

Adkins testified that she scheduled a visit between Appellant and J.J.O.  on February 15, 2002.  Adkins was present and observed the interaction between Appellant and J.J.O.  Adkins testified that Appellant was waiting in her office when she came in with J.J.O.  According to Adkins, Appellant was sitting on a couch, and she did not say hello to J.J.O. or get up to hug J.J.O. when she arrived.  Adkins further testified that Appellant did not talk to or interact with J.J.O., who stood in the middle of the room staring at Appellant.  Adkins testified that “this went on for an hour.”  Adkins later expressed to Appellant her concerns about the lack of interaction during the visit, but Appellant “never expressed any concern for [J.J.O.] at all.”  Adkins stated that the only response Appellant made with respect to her concerns about the interaction was to say, “I want her.” 

Adkins testified that from February through trial, Appellant did not regularly visit J.J.O.  As discussed in greater detail below, Appellant  intermittently visited with J.J.O. from February through June, when TDPRS lost contact with Appellant.  Appellant later met with J.J.O. once on September 26. Adkins testified that Appellant came to twelve of the weekly-scheduled hour-long visits, but she also stated that Appellant was late to four of those visits. She also testified that while the visits “seemed to get better later on, . . . it was either hit or miss.  Mom was either going to interact with her daughter slightly or not at all.”  In fact, Adkins described the September 26 meeting as “horrible” and a “very bad visit.”  Adkins testified that Appellant arrived ten minutes late, sat silently on the couch, and refused to play with J.J.O., even after Adkins encouraged her to do so.  J.J.O. repeatedly asked “Where’s my momma,” and was looking for her foster mother and not Appellant.  When they went back to the visitation room, “[J.J.O.] kept trying to get out of the room.” 

With respect to counseling, Adkins testified that Appellant did not engage in any counseling services.  Because of her concerns about the lack of interaction, Adkins placed Appellant’s name on a waiting list to attend attachment therapy classes.  Adkins stated that Appellant had problems with transportation, but she also stated that Appellant had disappeared by the time the classes were open to her.  During trial, Appellant admitted that she needed attachment classes because she was not attached to J.J.O.  Adkins also scheduled a psychological examination for Appellant in July, but that was also when TDPRS lost contact with her.  Appellant testified that the reason she did not attend counseling was because there was no funding for counseling.  Adkins testified that the State never ran out of funds to pay for counseling. 

Adkins also testified that she set up parenting classes for Appellant on Mondays from 4:00 to 5:30 and that she made arrangements to drive Appellant to those meetings.  Adkins drove her to the first meeting, but she did not drive Appellant to any other parenting classes after Appellant failed to show up for a ride to another class.  Appellant testified that she attended eight meetings and that she had transportation on the bus.  Appellant testified that there are eight parenting classes and that she took the first four and then repeated those same four classes.  Adkins testified that Appellant attended a total of four parenting classes. 

During the time Adkins was working with Appellant, she asked Appellant  to submit to a random urinalysis.  Appellant tested positive for cocaine.  Adkins testified that Appellant admitted that she used cocaine sometimes and was concerned because “she was living with no job and no place to live.”  Adkins said, “It was the kind of lifestyle I see in a lot of drug parents that I work with.” Appellant admitted that she had used cocaine and that she was pregnant with her second child at the time she was using drugs.  Appellant testified that she did not know she was pregnant at the time she used the cocaine and that she did not use drugs anymore. 

Because of Appellant’s drug use and her lack of any income or housing, Adkins offered to place Appellant in First Choice, an inpatient drug treatment program, beginning in June.  Adkins testified that at First Choice, Appellant “would attend parenting classes there, she would get all kinds of counseling; group, individual, and the attachment therapy.”  Additionally, the program would help Appellant get housing and job training when she completed the program, and First Choice would place J.J.O. with her there.  Adkins testified that Appellant refused to participate in the First Choice program.  At trial, Appellant gave the following reason for her refusal to be involved with the drug treatment program:  “I was waiting for my housing. . . . They had already called my name for housing[,] and I was waiting for it.”
(footnote: 5)  

From June to August, TDPRS lost contact with Appellant and was unable to contact her, despite its efforts to do so.  Appellant had never given any contact information to TDPRS concerning her location or anyone who could find her.  Adkins testified that she went to some of the hotels where Appellant liked to stay, but she was unable to locate Appellant because the rooms “were never listed in her name.”  Adkins learned toward the end of August that Appellant had been arrested for resisting arrest and for possession of drug paraphernalia, and she regained contact with Appellant while she was in jail on August 28. 

At trial, Appellant testified to the circumstances that led to her arrest in August.  She testified that she was “checking” the car Herrera had left her and “dozed off” in the back seat.  A police officer saw her sleeping in the car with both the driver’s door and a back door open.  The officer began questioning her and asked her to get out of the car.  Appellant admitted that as she reached down to pick up a shoe, “he came and I elbowed him,” which led to her arrest. While Appellant was sitting in the patrol car, another officer searched her car and found some crack pipes.  Appellant remained in jail from August 20 to August 28, and she testified at trial that the charges had been dismissed. 

During the August 28 meeting, Adkins advised Appellant that TDPRS intended to terminate her parental rights to J.J.O.  Adkins testified that, upon hearing TDPRS’s plan, Appellant did not ask about her daughter, but “[said] she wanted to see her.”  Appellant was going to be released that night, so Adkins asked Appellant to contact her the next day.  Despite Adkins’s request, Appellant waited a week before calling to schedule a visit with J.J.O.  Appellant testified that she sold Herrera’s car and used the money to live in hotels throughout the month of September before she ran out of money. 

Appellant eventually visited J.J.O. on September 26, as described above. Adkins spoke with Appellant after J.J.O. left the room and again told Appellant that she would be recommending that Appellant’s parental rights to J.J.O. be terminated.  Adkins testified that she told Appellant she would make the recommendation that she thought was in J.J.O.’s best interest.  According to Adkins, she told Appellant, “I’m working with you, who hasn’t seen her daughter in three months and refused to do drug treatment or any other services, and I said, if you were in my shoes, what would you do?  Would you recommend that your daughter be returned to you?”  Adkins testified that Appellant said, “[N]o, I wouldn’t at this time.” 

On cross-examination, Adkins testified that J.J.O. was examined when she came into TDPRS’s care.  She further testified that J.J.O. was in good health and agreed that she was “developmentally on-target.”  On redirect, however, Adkins testified that J.J.O.’s caregivers initially observed that she was withdrawn and did not interact or play well.  Adkins testified that, as time progressed, she noticed a “huge change” in J.J.O.  In contrast, Adkins testified that, over the eight months she had been working with Appellant, Appellant had not changed and was still exhibiting the same behaviors that she had exhibited when Adkins first began to work with her.  

Adkins asked the court to terminate Appellant’s parental rights.  CASA advocate Sandy Hage, who had visited with J.J.O. four to five times between April and October, also testified to the “vast change” in J.J.O. since she was placed in foster care.  Hage testified to her contact with J.J.O., and she also recommended terminating Appellant’s parental rights and testified that termination would be in the best interest of J.J.O. 

After hearing and considering all of the evidence, the trial court entered a judgment terminating Appellant’s parental rights.  The court made findings that termination was in J.J.O.’s best interest and that Appellant (1) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangered the physical or emotional well-being of the child, (2) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the physical or emotional well-being of the child, and (3) constructively abandoned the child who had been in the permanent or temporary managing conservatorship of TDPRS or an authorized agency for not less than six months.  
See
 
Tex. Fam. Code Ann. 
§§ 161.001(1)(D), (E), (N), (2) (Vernon 2002). 

II.  Points on Appeal

In two points, Appellant argues that the evidence is legally and factually insufficient to support the grounds for termination under section 161.001(1)(D), (E), and (N) and to support the trial court’s finding that termination of her parental rights was in the best interest of J.J.O.  
See id
.  The State argues that because Appellant failed to file a statement of points under family code section 263.405(b), she has forfeited her complaints on appeal.  
See id
. § 263.405(b).  Alternatively, the State responds that the evidence is both legally and factually sufficient to support the challenged findings. 

III.  Effect of Section 263.405(b)

We first address the State’s contention that Appellant waived her appellate points by failing to file a statement of points with the trial court in accordance with section 263.405(b) of the family code.  
See id
.  Family code section 263.405(b) provides that “[n]ot later than the 15
th
 day after the date a final order is signed by the trial judge, a party intending to appeal the order must file with the trial court a statement of the point or points on which the party intends to appeal.”  
Id
.  It is undisputed that Appellant timely filed her notice of appeal, but she did not file a section 263.405(b) statement of points.  
See id
.

In its brief, the State asks us to reconsider two of our opinions interpreting section 263.405.  
See id
.; 
In re W.J.H.
, 111 S.W.3d 707 (Tex. App.—Fort Worth 2003, pet. denied); 
In re D.R.L.M.
, 84 S.W.3d 281 (Tex. App.—Fort Worth 2002, pet. denied).  Neither of these cases, however, addresses the precise question before us:  whether the absolute failure to file a statement of points would waive an appellant’s nonjurisdictional issues on appeal.  During the pendency of this appeal, however, we have answered this question.
  See In re S.J.G.
, 124 S.W.3d 237, 240 (Tex. App.—Fort Worth 2003, pet. denied).

In 
S.J.G
., we examined section 263.405 in its entirety and observed that its “objectives are to address post-judgment delays, correct provisional inconsistencies, and provide a mechanism through which a party can compel the trial court to timely set the case for final trial.”  
Id
. at 242 (citing 
D.R.L.M
., 84 S.W.3d at 290).  We determined that “[c]onstruing noncompliance with subsection (b) as a waiver of all nonjurisdictional appellate issues does not reduce any post-judgment appellate time period and does not weed out frivolous parental-termination appeals.”  
Id
. at 243.  Thus, we held that under the facts, “[a]ppellant’s failure to file a statement of points is not a jurisdictional defect that prevents this court from addressing his issues on appeal.”  
Id
.  

After this case was submitted, we granted leave for TDPRS to file a supplemental brief, in which TDPRS asks us to reconsider 
S.J.G
., arguing that our holding in 
S.J.G
. renders the provision found in section 263.405 a nullity and is at odds with a decision from the Amarillo Court of Appeals.
  See In re T.C.
, No. 07-03-0077-CV, 2003 WL 21658314, at *2 (Tex. App.—Amarillo July 15, 2003, no pet.) (memo. op.) (declining to follow 
W.J.H
. and holding that appellant waived point that was not included in her section 263.405 statement of points).  Under the doctrine of stare decisis, we decline to reconsider 
S.J.G
.  
See Grapevine Excavation, Inc. v. Maryland Lloyds
, 35 S.W.3d 1, 5 (Tex. 2000) (“Adhering to precedent fosters efficiency, fairness, and legitimacy.”).  Accordingly, we reaffirm and follow 
S.J.G
.’s construction of section 263.405(b) of the family code, and we hold that Appellant’s failure to file a statement of points does not constitute a waiver of her nonjurisdictional issues on appeal.  
See
 
Tex. Fam. Code Ann. 
§ 263.405(b); 
S.J.G
., 124 S.W.3d at 243.  We now turn to Appellant’s legal and factual sufficiency challenges.

IV.  Termination of Parental Rights

A parent’s rights to “the companionship, care, custody and management” of his or her children are constitutional interests “far more precious than any property right.”  
Santosky v. Kramer
, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982).  “While parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.”  
In re C.H.
, 89 S.W.3d 17, 26 (Tex. 2002).

In a termination case, the State seeks not just to limit parental rights but to end them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child’s right to inherit.  T
EX
. F
AM
. C
ODE
 A
NN
. § 161.206(b) (Vernon 2002); 
Holick v. Smith
, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent.  
Holick,
 685 S.W.2d at 20-21;
 In re D.T.
, 34 S.W.3d 625, 630 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh’g).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one or more of the acts or omissions enumerated under subdivision (1) of the statute and must also prove that termination is in the best interest of the child.  T
EX.
 F
AM.
 C
ODE
 A
NN.
 § 161.001; 
Richardson v. Green
, 677 S.W.2d 497, 499 (Tex. 1984); 
Swate v. Swate
, 72 S.W.3d 763, 766 (Tex. App.—Waco 2002, pet. denied).  Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact.  
Tex. Dep’t of Human Servs. v. Boyd
, 727 S.W.2d 531, 533 (Tex. 1987).

A.  Burden of Proof

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by “clear and convincing evidence.”  T
EX
. F
AM
. C
ODE
 A
NN
. §§ 161.001, 161.206(a); 
In re G.M.
, 596 S.W.2d 846, 847 (Tex. 1980).  This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings.  
G.M.
, 596 S.W.2d at 847; 
D.T.
, 34 S.W.3d at 630.  It is defined as the “measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.”  
Tex. Fam. Code Ann.
 § 101.007.

B.  Standard of Review

The higher burden of proof in termination cases alters the appellate standard of legal sufficiency review.  
In re J.F.C.
, 96 S.W.3d 256, 265 (Tex. 2002).  The traditional no-evidence standard does not adequately protect the parent‘s constitutional interests.  
Id. 
 In reviewing the evidence for legal sufficiency in parental termination cases, we must determine “whether the evidence is such that a factfinder could reasonably form a firm belief or conviction” that the grounds for termination were proven.  
Id
. at 265-66.  We must review all the evidence in the light most favorable to the finding and judgment.  
Id.
 at 266.  This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so.  
Id.
  We must also disregard all evidence that a reasonable factfinder could have disbelieved.  
Id.
  We must consider, however, undisputed evidence even if it does not support the finding.  
Id.
  

The higher burden of proof in termination cases also alters the appellate standard of factual sufficiency review.  
In re C.H.
, 89 S.W.3d 17, 25 (Tex. 2002).  “[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance.”  
Id
.  In considering whether the evidence of termination rises to the level of being clear and convincing, we must determine “whether the evidence is such that a factfinder could reasonably form a firm belief or conviction” that the grounds for termination were proven.  
Id
.  Our inquiry here is whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that Appellant violated section 161.001(1)(D), (E), or (N) and that the termination of the parent’s parental rights would be in the best interest of the child.  
Id
. at 28.

C.  Constructive Abandonment

Appellant challenges the legal and factual sufficiency of the evidence with respect to the constructive abandonment ground for termination.  To establish constructive abandonment under section 161.001(1)(N), TDPRS must prove by clear and convincing evidence that:  (1) Appellant constructively abandoned J.J.O. who had been in the temporary managing conservatorship of TDPRS for not less than six months; (2) TDPRS made reasonable efforts to return J.J.O. to Appellant; (3) Appellant has not regularly visited or maintained significant contact with J.J.O.; and (4) Appellant has demonstrated an inability to provide J.J.O. with a safe environment.  
Tex. Fam. Code Ann.
 § 161.001(1)(N); 
In re K.M.B.
, 91 S.W.3d 18, 25 (Tex. App.—Fort Worth 2002, no pet.).  Because Appellant concedes that TDPRS met its burden with respect to the first and second elements, we need only address whether there is legally and factually sufficient evidence that Appellant has not regularly visited or maintained significant contact with J.J.O. and that she has not demonstrated an ability to provide J.J.O. with a safe environment.  
See 
Tex. Fam. Code Ann.
 § 161.001(1)(N); 
In re K.M.B.
, 91 S.W.3d at 25 

Appellant points to the fact that she made twelve visits with J.J.O. during the nine month service plan as evidence that she maintained significant contact with J.J.O.  During trial, Appellant testified that TDPRS scheduled weekly hour-long visits with J.J.O.  Appellant testified that she initially thought one hour was not long enough but, as time went on, she changed her mind.  Appellant stated, “I had other things I was worrying about at that time,” and she agreed that, “[l]ater on,” the hour-long visitations became a burden.  Appellant explained that she had difficulty visiting J.J.O. because she was sick and had found out that she was pregnant with her second child. 

In its brief, TDPRS presents a detailed chronology of the scheduled visits between Appellant and J.J.O.  After TDPRS took J.J.O. into custody, Appellant first met with her on February 15, 2002.  Appellant did not touch or speak to J.J.O. for the entire hour.  On February 27, Appellant called and cancelled the visit forty-five minutes after it was to have started.  Appellant was on time for visits on the first and eighth of March.  On March 12, Appellant arrived thirty minutes late, but she was on time for the visit on March 19.  Adkins testified that Appellant failed to show up for the visits on March 26 and April 2. 

Appellant then attended three visits in April before missing the scheduled April 30 visit.  Appellant did not show up for the May 7 visit, but she attended the May 14 visit.  J.J.O. was sick on June 4, so that visit was cancelled. Adkins testified that, on June 11, Appellant was twenty minutes late, spent ten minutes in the bathroom, and left ten minutes early.  Appellant failed to attend either the June 18 or June 25 meetings and lost contact with TDPRS until Adkins found her in jail on charges of resisting arrest and possession of drug paraphernalia. 

When Appellant was released from jail, she waited a week before calling TDPRS to schedule another visit.  Appellant testified that the appointment was scheduled for September 9, and “I was late.”  Adkins testified that the visit was scheduled for September 11 and that she waited with J.J.O. for thirty minutes before leaving.  Appellant waited until September 18 to contact TDPRS about setting up another visit, which was set for September 26.  Appellant arrived ten minutes late for the September 26 visit, which was her first visit with J.J.O. since June 11.  As mentioned above, Adkins testified that the September visit was “horrible” and “a very, very long hour.”  Appellant also admitted that it was not a good visit.  Adkins testified that “[t]he interaction was terrible,” and further testified that Appellant “did not say one word to that child,” even though “[she] hadn’t seen her child in three months.”  Additionally, J.J.O did not did not recognize Appellant as her mother and, instead, referred to her foster mother as “momma.” 

 After carefully reviewing and considering the evidence, we hold the evidence is both legally and factually sufficient to support the trial court’s finding that Appellant has not regularly visited or maintained significant contact with J.J.O.  
See 
Tex. Fam. Code Ann.
 § 161.001(1)(N)(ii); 
In re R.M.
, No. 14-02-00221-CV, 2003 WL 253291, at *5 (Tex. App.—Houston [14
th
 Dist.] Feb. 6, 2003, no pet.) (memo. op.) (holding evidence legally and factually sufficient to show appellant did not regularly visit or maintain significant contact with child); 
In re H.R.
, 87 S.W.3d 691, 699 (Tex. App.—San Antonio 2002, no pet.) (holding evidence was legally and factually sufficient to support constructive abandonment where evidence reflected intermittent visits); 
In re P.R.
, 994 S.W.2d 411, 416 (Tex. App.—Fort Worth 1999, pet. dism’d w.o.j.) (holding evidence sufficient to support constructive abandonment finding where mother sporadically visited child, used drugs, and failed to comply with service plan), 
disapproved of on other grounds by J.F.C.
, 96 S.W.3d at 267.

In regard to the fourth element of constructive abandonment, Appellant argues that she has a “proven history of taking care of her child considering that J.J.O. was considered healthy and developmentally on target” at the time TDPRS examined J.J.O.  Appellant claims that, because she testified that she was living in an apartment and planned on finding child care for J.J.O., the evidence is legally and factually insufficient to support the fourth element of section 161.001(1)(N).  
See 
Tex. Fam. Code Ann.
 § 161.001(1)(N)(iii).  We disagree.

We acknowledge that Appellant testified that she had recently found housing and that she planned on starting work on October 8, 2002.  The record reflects, however, that TDPRS became involved with Appellant when she left her baby J.J.O. alone in a hotel room.  During trial, Appellant admitted that she neglected J.J.O. by leaving her in the hotel room.  Appellant also admitted that she had been arrested for prostitution.  Throughout the time TDPRS was working with Appellant, she quit her jobs and lived predominantly in hotels and motels, which were paid for by people she described as “friends.”  Thus, Appellant failed to maintain steady housing or employment.  During that time Appellant—while pregnant with her second child—tested positive for cocaine and then refused available drug treatment.  A few months later, she was arrested for possession of crack pipes.  Further, Appellant only attended half of her parenting classes, and she missed the opportunity for counseling and a psychological evaluation when she disappeared for three months. 

We have carefully reviewed the entire record.  Looking at all of the evidence in the light most favorable to the trial court’s findings, giving due consideration to evidence that the fact finder could reasonably have found to be clear and convincing, we hold that a reasonable trier of fact could have formed a firm belief or conviction that Appellant constructively abandoned J.J.O. under section 161.001(1)(N).  
See id.
  

Appellant challenges the legal and factual sufficiency of all three of the statutory grounds for termination pleaded by TDPRS.  However, only one finding under section 161.001(1) is necessary to support a judgment of termination. 
 Id
. 
§ 161.001(1); 
In re D.M.
, 58 S.W.3d 801, 813 (Tex. App.—Fort Worth 2001, no pet.);
 In re S.F.,
 32 S.W.3d 318, 320 (Tex. App.—San Antonio 2000, no pet.); 
see also Tex. Dep't of Human Servs. v. E.B.,
 802 S.W.2d 647, 649 (Tex. 1990) (op. on reh’g).  Accordingly, because we conclude there is both legally and factually sufficient evidence to support the trial court’s finding under family code section 161.001(1)(N), we need not address Appellant’s remaining points with respect to the trial court’s findings under section 161.001, subsections D and E.  
See
 
Tex. Fam. Code Ann. 
§ 161.001(1)(D), (E), (N); 
Tex. R. App. P.
 47.1.  We overrule Appellant’s first point.

D.  Best Interest of the Child

Appellant also challenges the legal and factual sufficiency of the evidence with respect to the trial court’s finding that terminating her parental rights was in the best interest of J.J.O.  Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(1) the desires of the child;

(2) the emotional and physical needs of the child now and in the future;

(3) the emotional and physical danger to the child now and in the future;

 

(4) the parental abilities of the individuals seeking custody; 

(5) the programs available to assist these individuals to promote the best interest of the child;

(6) the plans for the child by these individuals or by the agency seeking custody;

(7) the stability of the home or proposed placement;

(8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(9) any excuse for the acts or omissions of the parent.

Holley v. Adams
, 544 S.W.2d 367, 371-72 (Tex. 1976).  These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.  
C.H
., 89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the children.  
Id.
  On the other hand, the presence of scant evidence relevant to each 
Holley
 factor will not support such a finding.  
Id.

Hage testified that it was in the best interest of J.J.O. to terminate Appellant’s parental rights.  She testified that based on the information on file and her observations of Appellant and J.J.O., she “[did not] believe [Appellant] currently has any way to provide for [J.J.O.] or care for her.”  In addition, Hage stated that “because of what I’ve seen in the visits and [J.J.O.’s] demeanor, I would have great concern for [J.J.O.’s] emotional health.”  Thus, Hage recommended that the court terminate Appellant’s parental rights. 

Hage was present during Appellant and J.J.O.’s visit in June, and she testified that Appellant held then two-year-old J.J.O. for a while, but that J.J.O. “sat there with her fingers in her mouth” and did not interact.  Hage later testified that during her last observation of Appellant and J.J.O. at their September 26 visitation, J.J.O.’s “body stiffen[ed]” when Appellant walked in the room.  According to Hage, J.J.O. walked over to Appellant “like she had lead in her shoes, . . . and she kept looking for the foster mom.”  She described how J.J.O. wanted to leave the room because she did not want to be in the room with Appellant.  Adkins testified that J.J.O. asked for her foster mother “over and over.” 

Appellant refers to Adkins’s testimony that J.J.O. was healthy and developmentally on-target at the time TDPRS examined her.  Adkins and Hage, however, testified that despite J.J.O.’s physical health, she was shy,  withdrawn, and did not interact well with her care givers.  Both  Adkins and Hage attested to the changes in J.J.O., which resulted from her living in foster care.  Adkins testified that, whereas J.J.O. was withdrawn and quiet at first, at the time of trial “[s]he smiles, . . . runs, and plays; . . . she can say her A-B-C’s; and she can sing songs.”  Likewise, Hage testified that the first time she visited J.J.O. in foster care, J.J.O. “kept her fingers in her mouth the whole time, . . . didn’t talk, . . . [and] didn’t smile.”  Since that meeting, Hage noticed a “vast change” in J.J.O.  For example, on one of Hage’s visits, J.J.O. was smiling, laughing, swimming, and playing.  J.J.O. also did not put her fingers in her mouth, and she was talking with her foster mother. 

Adkins testified that in the visits Appellant had with J.J.O. between January and June, the interaction was either “hit or miss.”  Both Adkins and Hage testified that the final visitation between Appellant and J.J.O. in September was not a good visit and that there was no interaction between mother and daughter.  During the trial, Adkins testified that, notwithstanding the fact that Appellant failed to complete counseling sessions, attend parenting classes, or obtain steady housing and employment, “there is an attachment issue.  [Appellant and J.J.O.] just don’t appear to have a bond.”  In contrast, Adkins testified that J.J.O. had bonded with her foster family. 

As described in greater detail above, Appellant has failed to stabilize her lifestyle.  She admitted that she neglected J.J.O. by leaving her in the hotel room alone.  She used cocaine not only at a time when she was supposed to be complying with TDPRS’s service plan, but also while she was pregnant with her second child.  Appellant refused the opportunity to receive inpatient drug treatment, where she would have been reunited with J.J.O. because she claimed to be waiting on housing.  Then, Appellant was arrested after the police found her sleeping in a car with drug paraphernalia.  Until the time of trial, Appellant had failed to maintain steady housing or employment.  When Adkins was asked whether she thought Appellant would do anything different if she was given additional time to work at her service plan, Adkins stated, “It’s been eight months.  The child has been sitting and waiting on her for eight months, and I haven’t seen a difference, so I don’t know.”  Adkins testified that she had not seen a change in Appellant’s behaviors. 

J.J.O.’s biological father was never identified or located.  TDPRS attempted to locate men named Jesse Anderson and Al Smith, both of whom Appellant had identified as the possible biological father of J.J.O., but they were unsuccessful at finding the father.  Further, Adkins testified that no one had registered with the paternity registry claiming to be the father of J.J.O. Adkins testified that TDPRS’s plan for J.J.O. was “[a]doption with the foster family she’s with now.”  Adkins testified that the foster family was licensed to adopt and that they had expressed a desire to adopt J.J.O., with whom they had developed a bond.  

Appellant testified that she planned on working at Boston Market for seven dollars an hour, maintaining steady housing, and eventually putting J.J.O. in day care once her second child was born.  Appellant’s case was tried to the bench; therefore, the trial court judged the credibility of the witnesses and determined the weight to be accorded to their testimony.  
See Davis v. Travis County Child Welfare Unit, 
564 S.W.2d 415, 420-21 (Tex. App.—Austin 1978, no writ).  A trial court can measure the future conduct of parents by their recent past conduct, but is not required to believe that there has been a lasting change in a parent’s attitude since his or her children were taken.  
Id. 
at 421.  Here, the trial court, after considering and weighing all of the evidence, could have rejected Appellant’s claims that she intended to change her lifestyle to provide and care for J.J.O.

Having carefully reviewed the entire record, we conclude that there is both legally and factually sufficient evidence to support the trial court’s finding under family code section 161.001(2) that termination of Appellant’s parental rights is in the best interest of J.J.O.  
See
 
Tex. Fam. Code Ann. 
§ 161.001(2).  Accordingly, we overrule Appellant’s second point.

V.  Conclusion

Having overruled both of Appellant’s points, we affirm the trial court’s judgment.

ANNE GARDNER

JUSTICE

PANEL A: CAYCE, C.J. and GARDNER, J.; and SAM J. DAY, J. (Retired, Sitting by Assignment)

DELIVERED:  March 11, 2004

FOOTNOTES
1:
Effective February 1, 2004, the legislature renamed TDPRS as the Texas Department of Family and Protective Services (TDFPS). 
See
 Act of June 6, 2003, 78
th
 Leg., R.S., H.B. 2292, §§ 1.27, 1.29(b) (stating that a reference in law to TDPRS also means TDFPS and providing the effective date of the name change).  In this opinion, we will use TDPRS as the agency name.

2:
Testimony revealed that Appellant’s room had been registered under the name of a man whom Appellant referred to as one of her friends, but who had only known Appellant for a week and was only able to identify Appellant by her first name and physical description. 

3:
According to Officer Tarrant, the criminal charges were later dropped. 

4:
Despite Appellant’s testimony that Herrera was unaware that she was pregnant with his child, Appellant also testified that “my baby’s father had left me some money for the second baby.” 

5:
When Appellant testified about waiting on “housing,” she was referring to low-income housing through CPS and the Arlington Housing Authority.