

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 02-13-00021-CV

IN THE INTEREST OF S.A.N.,
A CHILD

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

Appellant J.H. (Mother) appeals the trial court's judgment terminating her parental rights to her son S.A.N. In two issues, Mother argues that the evidence is legally and factually insufficient to support the trial court's constructive abandonment finding and that the evidence is factually insufficient to support the

---

[1]*See* Tex. R. App. P. 47.4.

trial court's finding that termination of her parental rights is in S.A.N.'s best interest. We affirm.[2]

## II. Background

Jeannette Leong testified at the December 2012 termination trial that she was the Child Protective Services (the Department) caseworker assigned to S.A.N.'s case. The Department became S.A.N.'s temporary managing conservator in January 2012 and had remained as such through trial. Leong testified that S.A.N. was initially placed into foster care because of a laceration injury inside his mouth. His hospital records include a notation that "it was as if something was shoved in[to] his mouth." The Department issued a "reason to believe" disposition to Mother for physical abuse concerning S.A.N.'s mouth injury. Mother initially told Leong that she thought S.A.N.'s grandmother (Father's mother) had injured S.A.N., but Mother later told Leong that either she or S.A.N.'s grandmother had accidentally injured him.

Leong testified that Mother had attended only two of sixteen scheduled visitations with S.A.N. between September and December 2012. Mother attended one visit in September and one visit in November. Mother did not attend any visitations in October and had not attended any of the three scheduled visits in December. Leong testified that the lack of visits concerned

---

[2]L.N. (Father) is S.A.N.'s biological father. Father executed an affidavit of waiver of interest in the case and is not a party to this appeal.

her because Mother was "not strengthening the parent/child bond and [was] not demonstrating an interest in his well-being."

When asked to describe Mother's parenting skills, Leong testified that Mother "tries at times" but "is not always on-target," and Leong testified that Mother inappropriately referred to S.A.N. as "sexy" during a visitation when S.A.N. was two months old. S.A.N. was fussy during a March 2012 visitation, and Leong suggested to Mother and Father that they stand up and walk around with S.A.N. Mother asked Father to take S.A.N., and Father asked Mother to take S.A.N. Mother then texted on her phone and waited until Father stood up and walked around with S.A.N.

Leong testified that she suggested to Mother that she complete a parenting class and that Mother take additional parenting classes. Leong believed that Mother needed to strengthen her parenting skills, and she testified that she tried to help Mother with her parenting skills by modeling appropriate actions during visitations, showing Mother how to carry S.A.N. and how to remove him from his car seat.

Leong also expressed concern about Mother's hygiene during the case, testifying that Mother had a strong odor at early visits that seemed to contribute to S.A.N.'s irritability and that she tried to address Mother's hygiene with her by suggesting that Mother keep a set of clothes separate to wear to visitations. Leong testified that Mother was homeless at one time during the case and that Mother had lived in eight different places—including at least two motels, a night

3

shelter, and in friends' homes or apartments—within the past year. Mother had lived with her mother at some of these locations, and Leong testified that Mother and her mother were "co-dependent on each other." Mother's mother's parental rights to one of Mother's siblings had also recently been terminated by a court.

Leong testified that Mother had not demonstrated an ability to provide S.A.N. with a safe and stable living environment. Mother provided Leong with only one address to visit, and that address was the residence of a mentor family that Mother had briefly lived with after being referred there by her Positive Influences therapist. Mother told Leong of all of her other residences but would not provide Leong with an address; Mother instead told Leong to send her mail to the mentor's home. Mother had also told Leong that she had been employed at Walmart but had not provided any paystubs as confirmation.

Leong provided Mother a service plan and scheduled Mother for various appointments to help Mother reunite with S.A.N., including individual counseling with Positive Influences. But the therapist unsuccessfully discharged Mother after seven months because Mother had attended only five sessions. Leong testified that the therapist reported that Mother's "limited engagement in therapy" contributed to Mother's pattern of unhealthy choices. Leong also testified that Mother's failure to complete counseling caused her concern for S.A.N.'s best interest. Leong elaborated,

> The therapist had said from the beginning that [Mother] had some very co-dependent behaviors, some unresolved issues of being raised with -- in an unstable childhood and life, and the

4

therapist was wanting to work with her to be able to recognize those co-dependent behaviors and to recognize those things in the past so that she could move forward, break away from that into a healthier lifestyle.

. . . .

[S.A.N.]'s an infant. Everything in terms of his healthy growth, his healthy development, going to the doctors, his therapy, is dependent on a parent who can make appointments, keep appointments, reschedule things as they're needed, and she has to be willing to put a complete focus on him, because she's the only one. There is no one else to do it. And with her having these co-dependent issues, with trying to take care of her [own] mother, moving from place to place and not being able to make her own appointments with the therapist or other services she didn't complete, it's not providing assurances to us that she can fulfill all of [S.A.N.]'s needs.

Mother was also scheduled for a domestic violence awareness program but did not complete it. Mother also failed to maintain regular contact with Leong beginning in about September 2012. Leong testified that Mother had not shown an ability to meet S.A.N.'s emotional and physical needs because Mother

hasn't demonstrated the ability to maintain a safe living environment, she hasn't demonstrated the ability to provide for food and ongoing expenses, she hasn't demonstrated the ability to increase her knowledge to provide a safe environment to prevent -- to become more knowledgeable on domestic violence, she hasn't been consistently visiting him to demonstrate the parent/child bond or to try to develop that further, she hasn't demonstrated the ability to work through some of these past issues with the therapist to make herself a healthier person ongoing in raising her son.

Leong testified that S.A.N., as of the time of trial, was "a happy, healthy little guy" overall but that there were several issues his foster parents were

5

addressing, including reflux and ear infections for which he had ear tubes placed. Otherwise, she said, S.A.N. was on target developmentally.

Leong opined that termination of Mother's parental rights to S.A.N. was in S.A.N.'s best interest and that the Department intended to place S.A.N. for adoption by a nonrelative. Specifically, S.A.N.'s current foster parents want to adopt S.A.N. Leong described the current foster parents as very attentive to all of S.A.N.'s needs and proactive with regard to his medication and allergies.

On cross-examination, Leong testified that Mother attended visitations "fairly consistently" before September 2012 and that Mother brought items for S.A.N. to be taken back with him to the foster family. Leong did not know why the visitation absences began in September. Leong also testified that Mother typically blamed others for her difficulties or shortcomings but had occasionally reported being sick or having transportation problems.

Mother testified that she was nineteen years old at the time of trial. She had completed eleventh grade and had recently applied to a career college where she could earn a diploma and begin taking college-level courses. Mother testified that she believed S.A.N.'s grandmother or aunt injured S.A.N.'s mouth in January 2012 because they were the only ones around him at the time. Mother testified that she had taken a shower while S.A.N. slept, and Father was not around that day.

Mother acknowledged that she had received a service plan early in the case. She began the individual counseling and attended seven out of twelve

6

sessions. Mother testified that a staff person from the counselor's office said that the Department had not sent all the necessary paperwork for Mother to attend the last five sessions. Mother testified that she last attended counseling in September 2012. However, Mother testified that she had completed parenting classes and had received a certificate of completion.

Mother also testified that she had tried to take domestic violence classes through SafeHaven, but SafeHaven referred her to the Department liaison. Mother said the Department liaison never returned her call. Mother also testified that the domestic violence classes at 9 a.m. were "too early in the morning for [her] to be able to even make it to." Mother testified that she had transportation problems and that she relied on her friend to take her to her appointments. Her friend could not take her to morning appointments because of his work schedule. Mother admitted, however, that Leong had given her bus passes.

Mother testified that she had worked at Walmart from April through October 2012 and had more recently been trying to start a business "hauling off scrap metal, cleaning people's yards, houses, and other things around the house." Mother testified that she lost her job at Walmart because of a computer glitch that "messed up scheduling[,] and a bunch of people got fired for it." She testified that she was unknowingly scheduled for certain shifts and was fired for inconsistent attendance. Mother said that she had recently received a call from Walmart and was informed that they were looking into reinstating her job. Even so, Mother acknowledged not having regular employment as of the time of trial.

7

Mother testified that she and her mother were currently living with a friend of Mother's and had lived there for a little over one month. Neither Mother nor her mother was on the lease, nor were they paying rent. Mother planned for her and S.A.N. to share one of the bedrooms in the three-bedroom apartment if S.A.N. were returned to Mother. Mother testified that she had clothing, a crib, a toddler bed, and toys ready for S.A.N.

Mother testified that she wanted S.A.N. to return home to her but acknowledged that she was "probably" not "in the best position to do that" as of the time of trial. Mother did not want her parental rights terminated and testified that she could provide a stable home for S.A.N. Mother testified that she had encountered difficulty doing things within the time Leong had asked that they be done but that she wanted to continue working services and do whatever was necessary to not have her parental rights terminated, even paying for her counseling sessions.

Mother testified that she had made only four out of sixteen visits since September 2012 and agreed that four out of sixteen was not very many. Mother reported that her mother was hospitalized in September through mid-October, and her transportation problems started at that time.[3] Mother testified that after her mother's release from the hospital, she tried unsuccessfully to contact Leong and was still unable to make visitations because of transportation problems.

---

[3]Mother testified that her mother was diagnosed in September 2012 with a brain tumor and that one doctor had said her mother had only six months to live.

8

Mother testified that she would have been able to attend more visitations had her mother not had medical problems.

Mother testified that her boyfriend had just given her his car and that she would have transportation once she obtained her driver's license. Mother also testified that she wanted to return to Georgia with S.A.N. because she had a larger support system there. Mother estimated during her testimony that she needed approximately six weeks to get into a position to have S.A.N. returned to her.

On cross-examination, Mother acknowledged that living in eight or nine places within eleven months did not demonstrate an ability to provide S.A.N. with a safe and stable home and agreed that Leong was not responsible or at fault for Mother's numerous residences. Mother also testified that she did not have a driver's license because she had not been able to pay $75 for a three-day class required by the State of Texas. She also needed her birth certificate and a Social Security card for the class, but she did not have either because she had lost them. Mother testified that she would have to return to Florida for her birth certificate because it could not be mailed to her and that she had applied for a copy of her Social Security card but had not returned to pick it up.

On January 2, 2013, the trial court signed an order terminating Mother's parental rights to S.A.N. The court's order set forth findings that termination of the parent-child relationship between Mother and S.A.N. was in S.A.N.'s best interest and that Mother had

9

constructively abandoned the child who ha[d] been in the permanent or temporary managing conservatorship of the Department . . . for not less than six months and: (1) the Department . . . ha[d] made reasonable efforts to return the child to the mother; (2) the mother ha[d] not regularly visited or maintained significant contact with the child; and (3) the mother ha[d] demonstrated an inability to provide the child with a safe environment.

Mother filed notice of this appeal on January 15, 2013.

## III. Standards of Review

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 & n.1 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Id.* at 563; *Holick*, 685 S.W.2d at 20–21.

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001 (West Supp. 2012), § 161.206(a). Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102

10

S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and conservatorship). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2008).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven and that termination is in the child's best interest. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.*

11

We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated subsection (N) of section 161.001(1) and that termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001(1)(N), (2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## IV. Statutory Abandonment

Mother argues in her first issue that the evidence is legally and factually insufficient to support the trial court's finding that she constructively abandoned S.A.N.

### A. Applicable Law

Under section 161.001(1)(N) of the Texas Family Code, a parent constructively abandons a child when (1) the child has been in the permanent or temporary managing conservatorship of the State or an authorized agency for at least six months; (2) the State or authorized agency has made reasonable efforts to return the child to the parent; (3) the parent has not regularly visited or maintained significant contact with the child; and (4) the parent has demonstrated an inability to provide the child with a safe environment. *See* Tex. Fam. Code Ann. § 161.001(1)(N); *In re M.R.J.M.*, 280 S.W.3d 494, 505 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g); *In re A.S.*, 261 S.W.3d 76, 88–89 (Tex. App.—Houston [14th Dist.] 2008, pet. denied).

### B. Discussion

Mother does not dispute that S.A.N. had been in the permanent or temporary managing conservatorship of the State or an authorized agency for at least six months. Mother does, however, contest the legal and factual sufficiency of the evidence to support the other three elements of the constructive abandonment ground for termination of her parental rights.

### 1. Reasonable Efforts to Return Child

Generally, the Department's implementation of a service plan is considered a reasonable effort to return a child. *M.R.J.M.*, 280 S.W.3d at 505; *In re K.M.B.*, 91 S.W.3d 18, 25 (Tex. App.—Fort Worth 2002, no pet.). Mother does not dispute that she was given a service plan to complete. Instead, Mother points to her own testimony at trial and argues that the Department "did not make reasonable efforts to provide access to the very classes and training that [it] required [Mother] to complete through their service plan" because the Department did not timely provide the paperwork for her last five counseling sessions, because the Department liaison never returned her call about domestic violence classes, and because the Department was not receiving Mother's communications in Fall 2012 about scheduling visitations with S.A.N.

The trial court, however, heard conflicting evidence on these topics. *See J.P.B.*, 180 S.W.3d at 573; *In re T.N.*, 180 S.W.3d 376, 382–83 (Tex. App.—Amarillo 2005, no pet.) ("[T]he fact finder, as opposed to the reviewing body, enjoys the right to resolve credibility issues and conflicts within the evidence. It may freely choose to believe all, part, or none of the testimony espoused by any particular witness."). Leong testified that she had scheduled various appointments for Mother, such as individual counseling with Positive Influences and a domestic violence awareness program. Mother was unsuccessfully discharged from counseling and had only "limited engagement" in the therapy sessions she had attended. Mother also did not attend the domestic violence

14

awareness program. Leong testified that Mother had failed to maintain regular contact with her beginning in about September 2012 and had failed to maintain safe and stable housing. Moreover, Leong testified that she suggested additional parenting classes for Mother and that she had personally tried to help Mother with her parenting skills by modeling appropriate parenting skills during early visitations. Applying the appropriate standards of review, we hold that the evidence is legally and factually sufficient to support the trial court's finding that the Department made reasonable efforts to return S.A.N. to Mother. *See J.P.B.*, 180 S.W.3d at 573; *see also H.R.M.*, 209 S.W.3d at 108.

### 2. Regular Visits or Maintaining Significant Contact

Mother argues that she had visited S.A.N. "fairly consistently" for the first eight months that he was in foster care and that although she had visited S.A.N. only four out of sixteen times beginning in September 2012, her visitations became irregular because of her mother's illness, which in turn caused her transportation problems. Again, however, the trial court heard conflicting evidence about Mother's failure to attend visitations and could have disbelieved Mother's testimony about her transportation issues and her mother's illness. *See J.P.B.*, 180 S.W.3d at 573; *T.N.*, 180 S.W.3d at 382–83. For example, Leong testified that she was unaware of the reason for Mother's failure to attend visitations beginning in September 2012 and that Mother had attended only two of sixteen possible visitations in the almost four months before trial, including that Mother had missed all three visits in the three weeks immediately before trial.

15

Leong also testified that the lack of visits was concerning because Mother was "not strengthening the parent/child bond and [was] not demonstrating an interest in [S.A.N.'s] well-being." This and other intermediate appellate courts have held that similar evidence is legally and factually sufficient under family code section 161.001(1)(N)(ii). *See In re J.J.O.*, 131 S.W.3d 618, 628–29 (Tex. App.—Fort Worth 2004, no pet.) (holding evidence legally and factually sufficient because the mother attended twelve visits in nine months, missed other visits because she was incarcerated, and did not interact with child during visits that occurred); *In re H.R.*, 87 S.W.3d 691, 699 (Tex. App.—San Antonio 2002, no pet.) (holding evidence legally sufficient to support constructive abandonment because the mother did not complete service plan, "intermittently" visited child for four months, but did not again visit child before trial); *see also In re F.E.M.*, No. 11-12-00257-CV, 2013 WL 1092716, at *2 (Tex. App.—Eastland Mar. 14, 2013, pet. filed) (mem. op.) (holding evidence of constructive abandonment legally and factually sufficient when father visited child only five of twenty-two or twenty-four available visitations).

### 3. Inability to Provide Safe Environment

Mother argues that there is insufficient evidence that she cannot provide a safe environment for S.A.N. She asserts that she was not present when S.A.N. was injured and that it is not known who injured him. Mother also points to her testimony about her current three-bedroom apartment and her desire to return with S.A.N. to Georgia where she will have additional family members to support

16

her. But Mother is not paying rent at her current apartment and is not listed on the lease. Moreover, Mother was homeless at one time during the case, had lived in eight different places within the past year, and had given Leong the address of only one of her residences. Mother lived with her mother at some of those places, but her mother's parental rights to one of Mother's siblings was recently terminated by a court. Mother had also been employed for only a few months at Walmart but had not provided any paystubs as confirmation. Moreover, Mother does not have a driver's license and testified that she must travel to Florida for her birth certificate before she can obtain a driver's license. Finally, Mother gave conflicting accounts to investigators about her possible role in S.A.N.'s January 2012 injury.

Applying the appropriate standards of review, we hold that the evidence is legally and factually sufficient to support the trial court's finding that Mother had not demonstrated an ability to provide S.A.N. with a safe environment. *See J.J.O.*, 131 S.W.3d at 630 (holding evidence of inability to provide safe environment legally and factually sufficient because mother attended only half of her parenting classes, lacked steady housing and employment, and missed opportunity for counseling and psychological evaluation); *see also H.N. v. Dep't of Family & Protective Servs.*, No. 08-11-00364-CV, 2013 WL 968209, at *6 (Tex. App.—El Paso Mar. 13, 2013, no pet.) (holding evidence of inability to provide safe environment legally and factually sufficient "[g]iven H.N's lack of stable employment and lack of a permanent and safe place to live in which [the child]

17

could reside"). We thus hold that the evidence is legally and factually sufficient to support the trial court's section 161.001(1)(N) finding, and we overrule Mother's first issue.

## V. Best Interest

Mother argues in her second issue that the evidence is factually insufficient to support the trial court's finding that termination of her parental rights is in S.A.N.'s best interest. *See* Tex. Fam. Code Ann. § 161.001(2) (requiring clear and convincing evidence "that termination is in the best interest of the child").

## A. Applicable Law

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

    (A)    the desires of the child;

    (B)    the emotional and physical needs of the child now and in the future;

    (C)    the emotional and physical danger to the child now and in the future;

    (D)    the parental abilities of the individuals seeking custody;

    (E)    the programs available to assist these individuals to promote the best interest of the child;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)    any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted). These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## B. Discussion

Mother contends that the evidence is factually insufficient to support the trial court's best-interest finding because Leong testified that S.A.N. is developmentally on-target; Mother testified that she believed she could provide S.A.N. with a stable home; there was no evidence of any present or future emotional danger to S.A.N.; Mother testified about her willingness to continue working services and to pay for them if necessary; Mother testified about her desire to move with S.A.N. to Georgia where she has a broader support structure; Mother testified that she had clothes, toys, and furniture at her

19

apartment for S.A.N.; there was no evidence of who actually injured S.A.N. in January 2012; and Mother's missed visitations were due to her own mother's illness and her resulting transportation problems. But again, the trial court heard conflicting evidence concerning most of the best interest factors and much of the evidence upon which Mother relies.

Mother did not complete her service plan and did not fully engage in the counseling sessions she attended. *See In re A.B.*, 269 S.W.3d 120, 129 (Tex. App.—El Paso 2008, no pet.) (noting parent's failure to complete service plan as relevant to best-interest analysis). Mother did not maintain contact with Leong, lived in at least eight different places in addition to being homeless for a time during the case, would not provide Leong with an address for all but one of the places Mother lived during the case, did not maintain stable employment, was not listed on the lease or paying rent at her current residence, and admitted to being unable at the time of trial to take custody of S.A.N. *See In re C.A.J.*, 122 S.W.3d 888, 894 (Tex. App.—Fort Worth 2003, no pet.) (concluding evidence was sufficient to support best-interest finding for mother who admitted being unable to care for child and had no stable source of income or permanent home). In addition, Mother gave conflicting accounts of who may have been responsible for S.A.N.'s injury in 2012, demonstrated poor parenting skills during visitations, and attended only two or four of the sixteen possible visitations in the four months before trial. *See D.F. v. Tex. Dep't of Family & Protective Servs.*, 393 S.W.3d 821, 834 (Tex. App.—El Paso 2012, no pet.) (discussing parent's

20

inconsistent attendance at visitation as relevant to best interest analysis), *abrogated on other grounds by In re E.C.R.*, No. 12-0744, 2013 WL 2660130, at *7 n.5 (Tex. June 14, 2013).  Mother also typically blamed others rather than taking responsibility for her shortcomings.

Finally, Mother testified about wanting to return to Georgia with S.A.N. but was unable to articulate how she would prepare herself to regain custody of S.A.N. despite her belief that she could fully do so within six weeks.  By contrast, S.A.N.'s current foster parents have expressed a desire to adopt S.A.N., and the Department plans to have the foster parents adopt him.

Applying the appropriate standard of review, we hold that the evidence is factually sufficient to support the trial court's finding that termination of Mother's parental rights is in S.A.N.'s best interest.  *See H.R.M.*, 209 S.W.3d at 108 (discussing factual sufficiency standard of review).  We therefore overrule Mother's second issue.

## VI.  Conclusion

Having overruled Mother's two issues, we affirm the trial court's judgment.


ANNE GARDNER
JUSTICE

PANEL:  GARDNER, MCCOY, and MEIER, JJ.

DELIVERED:  June 20, 2013

21