# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-18-00852-CV

---

**C. G. and B. E., Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 274TH DISTRICT COURT OF COMAL COUNTY**
**NO. C2015-0540C, THE HONORABLE DIB WALDRIP, JUDGE PRESIDING**

---

## MEMORANDUM OPINION

B.E. ("Beth")[1] appeals the trial court's decree terminating her parental rights to her four children who, at time of trial, were ages eight ("Jason"), seven ("Edwin"), five ("Alan"), and four ("Zoe"). C.G. ("Chad") appeals the trial court's decree terminating his parental rights to Alan and Zoe.[2] Beth contends that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the best interest of her four children. Chad contends that the evidence is legally and factually insufficient to support the trial court's finding that he committed a statutory ground for termination of his parental rights to his two children. We will affirm the termination decree.

---

[1] We will refer to the children and their family members by aliases. *See* Tex. R. App. P. 9.8 (related to protection of minor's identity in cases involving termination of parental rights).

[2] The trial court also terminated the parental rights of Jason and Edwin's father, J.V. J.V. has not appealed the trial court's decree terminating his parental rights.

## BACKGROUND

The Department of Family and Protective Services ("the Department") filed a "Petition to Modify Parent-Child Relationship in Suit Affecting the Parent-Child Relationship" November 13, 2017, seeking to terminate the rights of Beth to her four children and Chad to his two children after denial of a prior petition to terminate.

This case followed a suit filed April 8, 2015, which ended without termination November 28, 2016. The Department was appointed sole managing conservator. Beth was appointed possessory conservator of her four children, and Chad was also appointed possessory conservator of his two children (Alan and Zoe). The prior final possession orders provided as to the two younger children (Alan and Zoe) that each parent would have visitation and access "upon mutual agreement" and "failing mutual agreement . . . once per month, for up to two hours each visit, at a location in the county of the placement's residence." Beth's visitation regarding her two older children (Jason and Edwin) was to be as mutually agreed and failing such agreement once per month for up to two hours each visit in a therapeutic setting at the office of the children's therapist.

This case was called for bench trial December 17, 2018, at which the Department called eight witnesses and introduced several exhibits in support of its termination case. Beth appeared with her attorney; Chad did not appear and defaulted. In its opening statement, the Department asked for termination of the parents' rights under subsection 161.001(b)(1)(N) of the Texas Family Code, which requires the Department to prove its permanent or temporary conservatorship of the children for more than six months and to prove that the parents have constructively abandoned the children. *See* Tex. Fam. Code § 161.001(b)(1)(N).

Madeline Crain-Hewett, a licensed professional counselor, testified as therapist for Beth's two older children whom she treated for trauma and abuse every other week for approximately two years, having last seen them in August 2017 and discharged them successfully from therapy. Crain-Hewett remained in the case past the children's discharge to "supervise visitation or hold therapeutic visitation" for Beth.

Crain-Hewett testified that Beth had two visits January 30, 2017, and April 10, 2018, but for over 24 months, nine "appointments" had been scheduled by texting or emailing, out of which Beth attended two and cancelled seven. Beth made no contact with Crain-Hewett for 12 of those months. Of the two visits that occurred, Crain-Hewitt stated that the children were "slow to warm" as one would anticipate with an "unfamiliar relative." Crain-Hewett testified that "their relationship seemed neutral," and "you could tell the attachment had been greatly diminished." For the other visit, Beth arrived 38 minutes late to a 60-minute visit, Crain-Hewitt recalled. Crain-Hewitt did not believe the children would benefit from continued contact with Beth, and they were more bonded in their placement whom they recognized as their maternal figure.

The Department called Molly Hobbs, the Department's caseworker for this case after October 2017. Hobbs testified that the Department's concerns were "substance abuse, neglectful supervision, not showing up for visits, continuous drug use." Hobbs stated that Beth has shown her no proof of a safe, stable home, a driver's license, a high school diploma or GED, creating a bank account where she is depositing funds in lieu of paying court-ordered support, or working any services on her own. She stated Beth had submitted to only three drug tests despite being asked to take sixteen tests. The last drug test was taken in May 2018. Hobbs testified that Beth had made eight out of 23 visits for her two children not in therapeutic setting and out of the

3

eight visits, Beth appeared 1 to 1 ½ hours late for five.  Hobbs observed Beth "is very quiet with the children. . . .  She's very standoffish. . . .  The children are quiet with her.  There's definitely a lack in the bond."

Hobbs stated that Chad attended eight of 23 two-hour scheduled visits, and many times he would leave the visits for an hour to get the children food, and upon returning sometimes he would fall asleep.  Hobbs testified that she had attempted drug testing of Chad monthly, but he drug-tested only one time.  Regarding attempts to do home visits with Chad, Hobbs stated that he would not let her into his home.  She testified that communications with Chad were "sporadic," and he used obscenities to her and threatened to kill her twice.  Hobbs said that background checks showed Chad had marijuana possession arrests November 17, December 2 (2017), and July 3 (2018), and in the last arrest he was arrested with a scale and large amounts of cash, indicating "selling drugs."

The trial court admitted into evidence the following three official records regarding Chad: a 2009 judgment of conviction for a third-degree felony for possessing fifteen pounds of marijuana in a drug-free zone; a 2018 judgment of conviction for a misdemeanor offense for possession of marijuana; and a 2018 information for a misdemeanor offense for possession of marijuana.

Hobbs testified that the children refer to their foster parents as "mom" and "dad" and "they're very bonded," "well taken care of," and "they're happy."  Asked if she had any concerns about the children's foster care placement, Hobbs answered that she had no concerns with the foster parents' ability to meet the children's emotional and physical needs.  Hobbs, noting that the children had been in the "system" for three and one-half years, stated they need to

4

be adopted and out of the system. Hobbs testified the parents had shown no change for the better since her time in the case.

The Department called Chad's community supervision officer who testified that Chad had tested positive for marijuana and hydrocodone while on supervision. Asked whether Chad had treatment or any supervision appointments that would have prevented his appearing at the trial, the officer said no.

In her testimony, Beth testified to the following:

- she believed she had seen her two older children twice since January 2017 but could not remember how many times she had seen her two younger children,

- she could not say whether she had visited her children at all from February 2017 through September 2017,

- she lived with Chad for about five years,

- Chad dropped her off at the trial,

- she had "no idea" where Chad had gone because she did not "have control of wherever he goes,"

- she was unaware of Chad's ever having used marijuana,

- she had maybe four residences since January 2017 with some period of homelessness and three different jobs in the past two years with about a month of unemployment,

- she had not been able to put any money into a savings account for her children since being excused from paying court-ordered child support,

- she had three prior cases relating to the children, including two family-based safety services,

- she had a full-time job taking care of elderly individuals,

- she made approximately $900-$1,000 every two weeks and was paid between $11 and $16 per hour depending on if she worked overtime,

5

- Chad received "four-something a month" in disability,

- she and Chad "have a car, but it's . . . messing up pretty bad,"

- she was trying to eliminate her monthly car payment, and

- neither she nor Chad had driver's licenses.

The Department called each of the children's two placements. A step-grandmother had Jason and Edwin in her care for three and one-half years by placement and all told, four years of their lives. She testified they had some behavioral issues at school but were doing well in her home. She testified that Beth had not provided any assistance and had no contact with the placement. She testified that the children attend weekly therapy and counseling, and they call her mother. The two children also had bonded with other children in the home. She said she would be interested in adopting them.

The Department called the second placement where Alan and Zoe had been living for almost one year. The foster mother testified that she had known Alan and Zoe for about two and one-half years as their case manager in their prior foster home placement and then supervising their case manager and visiting them quarterly. She testified that visits are scheduled monthly but had been occurring every three months, except for back-to-back months before the trial. She testified that she and her husband were interested in adopting the children, and that she has the ability to meet the children's emotional and physical needs.

The Department called Toni Urban, a CASA volunteer for the two younger children who began the case in July 2015. Urban testified that she saw the children approximately three times a month and observed all eight visits the children had with Beth and Chad during the past year. Urban stated that the parents lacked the ability physically and emotionally to support the

children and recommended that Beth's and Chad's parental rights be terminated. Urban testified to the parents' criticism of the children, particularly Alan for not being able to read, for not being able to identify pictures in books, for his hair's appearance, for what he wears, and for being too short, among other things. The parents also were observed criticizing Zoey for not being able to read. Urban testified that the case began in April 2015, and she came into the case in July 2015 but had not seen any improvement. She testified that the parents had lived in at least three places and in between were "couch surfing" and "staying with different people, or that's what I've been told." Urban testified that the children's current placement was a safe and stable home and recommended that it be continued.

Rob Edwards, a CASA supervisor for all four children and caseworker for the two older children, testified that he had worked the case since June 2015, and that service plans had been created for both parents and reasonable efforts to return the children to their parents had been made, but that it was "very much in (the children's) best interests to terminate the parental rights" to enable adoptions by the current placements. Edwards noted that "the boys have made dramatic changes since they have been in this current placement," that they viewed "their current placement as their mother," "formed a very strong bond," and "lived in this home with the same people for longer than they've ever lived anywhere else." Edwards stated that he had observed with Julie Dorian, the CPS supervisor, the parents' trailer home and observed that he "couldn't say that it's stable considering they've only been there for maybe a couple months and the parents disagreed on how long they had been there." Additionally, Edwards noted "it looked a little dilapidated . . . there's no furniture in the living room . . . there's no furniture in any of the bedrooms. . . . The place certainly needs some work and it smelled very densely of cigarette smoke."

Edwards testified that Chad's income was reduced because he was collecting disability while working, leading to his being charged back for whatever he was claiming while working at the same time. Edwards recounted from the case history that "long-term employment" and "long-term living situations" had eluded the mother. A week before the trial, Edwards learned that Beth had been fired in July, went to work for a company in San Antonio, and then was hired back at her former New Braunfels employer. In the 42 months of the Department's two cases, the longest residence at one place was four months.

The Department asked the court to terminate both parents' rights under subsection 161.001(b)(1)(N) of the Family Code. The attorney ad litem for the children asked the court to terminate the parents' rights to the children under the same ground and in the best interests of the children. The trial court found that the Department had met its burden under 161.001(b)(1)(N) and that termination was in the children's best interests and, accordingly, terminated both parents' rights.

## DISCUSSION

A trial court may terminate parental rights if clear and convincing evidence shows that the parent committed conduct that amounts to a statutory ground for termination and that termination of parental rights would be in the child's best interest. *See* Tex. Fam. Code § 161.001(2); *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014). Beth does not challenge the sufficiency of the evidence to support the trial court's finding that she committed a statutory ground for termination but rather the sufficiency to support the trial court's best-interest finding. Chad does not challenge the sufficiency of the evidence to support the trial court's best-interest

8

finding but rather the sufficiency to support the trial court's finding that he committed a statutory ground for termination.

In reviewing legal sufficiency of the evidence, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that the finding was true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We assume that the factfinder resolved disputed facts in favor of the finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found to be incredible. *Id.*; *see In re K.M.L.*, 443 S.W.3d 101, 112-13 (Tex. 2014).

In evaluating factual sufficiency, we view the entire record and uphold the finding unless the disputed evidence that could not reasonably have been credited in favor of a finding is so significant that the factfinder could not reasonably have formed a firm belief or conviction that the Department's allegations were true. *In re A.B.*, 437 S.W.3d 498, 502-03 (Tex. 2014) (citing *J.F.C.*, 96 S.W.3d at 266; *In re C.H.*, 89 S.W.3d 17, 25-26 (Tex. 2002)). We defer to the factfinder's reasonable determination on issues of credibility that involve an evaluation of appearance or demeanor. *J.P.B.*, 180 S.W.3d at 573. We resolve disputed evidence in favor of the finding if a reasonable person could have found it clear and convincing. *J.F.C.*, 96 S.W.3d at 266.

### *Beth's Challenge to the Best Interest Finding*

Beth argues principally that the Department's only evidence that termination of Beth's parental rights was in the best interest of the children consisted of evidence that Beth had not visited the children enough during the suit. Beth asserts that due to the children's young ages at the time of trial, their desires were unclear and there was no evidence suggesting that the

9

children are fearful of their mother. Beth points to evidence that she has shown improvement during the case by securing housing and full-time employment and has thus alleviated the Department's concerns about the stability of her home environment if the children were returned to her. Beth also points to her testimony at trial that she "wanted her children."

A factfinder's best interest finding is reviewed in light of several factors set out in *Holley v. Adams*. 544 S.W.2d 367, 371-72 (Tex. 1976). These are (1) the child's wishes, if the child is of an appropriate age to express such wishes; (2) the child's present and future emotional and physical needs; (3) present and future emotional and physical danger to the child; (4) the parenting abilities of the individuals seeking custody; (5) programs available to assist those people seeking custody; (6) the stability of the home or proposed placement; (7) the parent's acts or omissions that may indicate that the parent-child relationship is improper; and (8) any excuse for the parent's acts or omissions. *Id.* The Department need not prove or produce evidence about all these considerations, and the *Holley* factors are not an exhaustive list of considerations. *C.H.*, 89 S.W.3d at 27. The absence of evidence of some factors does not bar the factfinder from finding by clear and convincing evidence that termination is in a child's best interest. *Id.* While courts "must recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *Id.* at 26.

We summarize here the evidence at trial of the *Holley* factors. The Department presented evidence that its primary concerns were the parents' substance abuse, neglectful supervision, failure to maintain scheduled monthly visits with the children, and the parents' failure to maintain stable employment or housing. The Department's caseworker testified that when Beth did visits with the children, she was standoffish and the children were very quiet

10

around her. The caseworker testified that Alan and Zoe are anxious before and after visits with their parents, and that Chad belittles the children and yells at Alan for not being able to read at age five. The Department presented evidence that Chad has a criminal record arising out of drug use and has at least three recent arrests for possession of marijuana. The caseworker testified that Alan and Zoe for the past year were living in a foster home, bonded to their foster parents, and refer to them as "Mom" and "Dad." The caseworker testified that the foster parents have taken care of the children and that they attend school. Alan is receiving therapy, and both children are happy.

The Department presented evidence that Jason and Edwin have been placed in a foster home for the past three-and-a-half years, are bonded with their foster mother, think of her as their mother, and are loved. The caseworker testified that she has seen no positive changes in Beth's or Chad's lives during the past three years and believes it is in the children's best interest for their foster placements to adopt.

The guardian ad litem for Alan and Zoe testified that during visits Chad consistently criticized Alan for not being able to read, criticizes his clothing, and has told Alan he "is too short and won't be able to play football." The ad litem testified that although Zoe is usually very talkative, she does not talk during her visits with Beth and Chad. Beth and Chad criticize Zoe for not being able to talk, which causes her to become more quiet. The ad litem testified that she has seen no improvement in Chad and Beth's circumstances during the past three years that she has been working with Alan and Zoe.

The CASA volunteer for Jason and Edwin, who is the CASA supervisor for all four children, testified that Jason and Edwin have made dramatic positive improvement since being placed in foster care. They have formed a strong bond with their foster mother, who is a

11

caregiver who provides for them and is able to identify problems and get appropriate help for the children. The volunteer testified that Beth has not maintained significant contact with Jason and Edwin and has only visited them two times in the past three-and-a-half years. The volunteer stated that he had been to the trailer where Beth and Chad have been living for the past two months and described it as smelling strongly of cigarette smoke and lacking furniture in the living room and the bedrooms. He testified that the trailer was "dilapidated" but "liveable." The volunteer testified that since 2015 he has been urging Beth and Chad to find a permanent home, but they have not lived in the same place for longer than three to four months and are often evicted for failing to pay rent.

Beth testified that she has seen Jason and Edwin two times since 2015. Beth testified that she could only attend seven of 23 monthly visits with Alan and Zoe. Beth stated that she has lived at four different addresses since 2017 and has had three different jobs and periods of unemployment. She currently lives with Chad in a trailer owned by a childhood friend. She has not saved any money for the children because all her money is used to pay bills and buy gas. Beth testified that if the children were returned to her, her plan was to switch to working the night shift and to be with the children during the day. Beth stated that she would study for her GED during work at night. Although Beth testified that it would be important for her to have a driver's license so she could drive legally with the children, she does not have one. Chad drives her to work and picks her up, and she gets home at 11:30 p.m.[3] Beth denied that Chad uses drugs or that he has been involved in dealing drugs.

Jason and Edwin's foster mother testified that they are doing very well in her home. She is dealing with their behavioral issues at school by meeting with the principal. Beth

---

[3] Chad did not attend the trial or provide any testimony.

12

has provided no monetary or other assistance for the children, has not visited them and has not sent them any birthday cards. Jason and Edwin are getting therapy for behavior issues and attention deficit hyperactivity disorder. The therapy is helping them. The foster mother testified that the children call her "Mom" and refer to her other children as their siblings. She stated that her children are bonded with Jason and Edwin and consider them little brothers. The foster mother testified that she would be interested in adopting Jason and Edwin if their parents' parental rights were terminated.

Alan and Zoe's foster mother testified that the children are in play therapy and are learning to deal with "big emotions." Alan is beginning to learn to read and Zoe is learning her letters and enjoys tracing. The foster mother stated that she believes the children are anxious before visits with Chad and Beth. The foster mother described their daily routine which included breakfast and dinner together, daycare for Zoe and preschool for Alan, and evening playtime and story time. She stated that she and her husband would be interested in adopting the children if their parents' parental rights were terminated.

The evidence at trial demonstrated that the children have had very little contact with Beth and Chad in the more than three years they have been in the Department's care. They are bonded with their foster parents and reside in safe, stable, protective homes with people who have expressed love for the children and an interest in adopting them. Beth and Chad presented scant evidence that either could provide the children with a safe and stable home, or that the children's emotional needs would be met. Beth did not address whether she would continue taking them to the current therapy that has addressed their behavioral issues. Several witnesses testified that Beth and Chad have been given ample time and opportunity to make positive

13

changes in their lives but have not "stepped up" to try to improve their circumstances in the manner required to meet the emotional and physical needs of the four children.

We conclude, having reviewed the above-summarized and other evidence in the light most favorable to the trial court's finding, that the trial court could reasonably have come to a firm belief or conviction that termination of Beth's parental rights was in the best interest of the children. Accordingly, we conclude that the evidence is legally sufficient to support the court's finding by clear and convincing evidence that termination of Beth's parental rights is in the children's best interest. We reach the same conclusion regarding the factual sufficiency of the evidence after giving due consideration to the disputed evidence in this case. Deferring to the trial court's role to assess the credibility of the witnesses, we conclude that the disputed evidence is not so significant that a reasonable factfinder could not form a firm belief or conviction that terminating Beth's parental rights was in the best interest of the children. We conclude that the evidence is factually sufficient to support the court's finding by clear and convincing evidence that termination of Beth's parental rights is in the children's best interest. We overrule Beth's sole appellate issue.

### *Chad's Challenge to the Statutory Ground for Termination*

The trial court found that Chad constructively abandoned Alan and Zoe. *See* Tex. Fam. Code § 161.001(b)(1)(N). A parent constructively abandons a child when (1) the child has been in the permanent or temporary managing conservatorship of the Department or an authorized agency for not less than six months, (2) the Department or the authorized agency has made reasonable efforts to return the child to the parent, (3) the parent has not regularly visited or maintained significant contact with the child, and (4) the parent has demonstrated an inability

14

to provide the child with a safe environment. *Id.*; *In re A.S.*, 261 S.W.3d 76, 88-89 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). Chad contests the second, third, and fourth elements of the constructive abandonment ground.

The Department's preparation and administration of a service plan for the parent constitutes evidence that the Department made reasonable efforts to return the child to the parent. *See, e.g.*, *In re K.M.B.*, 91 S.W.3d 18, 25 (Tex. App.—Fort Worth 2002, no pet.). The record contains a service plan the Department created for Chad. Chad's service plan included that he (1) complete parent/caregiver training; (2) complete individual counseling; (3) complete a psychological evaluation; (4) allow access to his home; (5) demonstrate an ability to meet the children's basic needs by providing stable housing, medical care, clothing, and food; and (6) provide appropriate housing that is drug free.

The Department's caseworker testified that she attempted to contact Chad regularly to request that he take drug tests, schedule visits with him, and determine whether he and Beth had secured stable, drug free housing and employment. The caseworker testified that Chad would not allow her to visit his home and he only completed one drug test. The CASA caseworker supervisor testified that the Department had gone "above and beyond" to try to work with Chad, who was aggressive on the phone, threatened a caseworker, and used obscenities when communicating with representatives of the Department. The caseworker persisted in trying to set up appointments and assist Chad with work on his parenting service plan, and a lack of communication was not the Department's fault. This constitutes sufficient evidence to support the trial court's finding that the Department made reasonable efforts to return the children to their parents.

15

Chad only visited Alan and Zoe on eight of the 23 opportunities provided to him. "A parent fails to regularly visit or maintain significant contacts with the child if the parent fails to take advantage of the visitation rights or if the visits are intermittent or sporadic." *In re S.S.*, No. 11-05-00083-CV, 2006 WL 1285125, at *3 (Tex. App.—Eastland May 11, 2006, no pet.) (mem. op.). Testimony was presented that Chad sometimes left for an hour or so during the two-hour visits he did attend and that he sometimes fell asleep during them and often ignored Alan in favor of using his phone. Chad did not appear at the trial and there was no evidence that Chad attempted to contact the children by telephone, or that he sent them birthday cards or gave them any form of monetary or emotional support. Sufficient evidence supported the trial court's finding that Chad failed to visit regularly or maintain significant contacts with Alan and Zoe. *See In re J.J.O.*, 131 S.W.3d 618, 630 (Tex. App.—Fort Worth 2004, no pet.) (visiting only twelve times in nine months despite weekly scheduled visits supported termination for constructive abandonment).

When determining whether a parent has demonstrated an inability to provide a child with a safe environment, the factfinder may consider the parent's participation in services and visitation, lack of stable housing, missed opportunities for counseling, psychological evaluation, and past substance abuse. *See In re B.C.*, No. 07-13-00078-CV, 2103 WL 4624618, at *3 (Tex. App.—Amarillo Aug. 1, 2013, pet. denied) (mem. op.). There was testimony that Chad had repeated arrests for possession of drugs and that he repeatedly refused to perform drug testing requested by the Department. There was testimony that Chad made no efforts to cooperate with the Department to complete a service plan and, instead, was verbally abusive and threatening to Department representatives. Chad's probation officer testified that he had a positive drug test for marijuana and non-prescribed hydrocodone. There was evidence that Chad and

16

Beth frequently move and usually do not stay in one place for more than three months at a time. Their current residence is a "dilapidated" trailer owned by one of Beth's friends for which they have no lease. There was evidence that there was no furniture in the bedrooms and living room in the trailer that the Department representatives were allowed to inspect. There was sufficient evidence to support the trial court's finding that Chad was unable to provide the children with a safe environment.

Based on the foregoing, the trial court could reasonably have formed a firm conviction or belief that Chad constructively abandoned Alan and Zoe by failing to regularly visit or maintain significant contact with them, by demonstrating an inability to provide them with a safe environment, and by failing to complete his service plan despite the Department's reasonable efforts to return Alan and Zoe to him. *See* Tex. Fam. Code § 161.001(b)(1)(N). We overrule Chad's sole appellate issue.

## CONCLUSION

Having overruled Beth's and Chad's appellate issues, we affirm the trial court's decree terminating Beth's parental rights to her four children and Chad's parental rights to his two children.

_____

Thomas J. Baker, Justice

Before Justices Goodwin, Baker, and Triana

Affirmed

Filed   July 26, 2019

17