**Affirm in part; Reverse in part and Opinion Filed June 17, 2021**



In The

# Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-20-00652-CV

## IN THE INTEREST OF D.P.G., A CHILD

**On Appeal from the 196th Judicial District Court**
**Hunt County, Texas**
**Trial Court Cause No. 87836**

# MEMORANDUM OPINION

Before Justices Schenck, Molberg, and Nowell

Opinion by Justice Nowell

Mother and Father appeal the trial court's order terminating their respective parental rights to D.P.G. On December 9, 2020, a panel of this Court affirmed the trial court's order of termination as to Mother and reversed the order of termination as to Father. Today we withdraw our December 9, 2020 opinion and vacate the judgment of that date. After reviewing the record, we conclude the evidence is legally and factually sufficient to support the trial court's order of termination as to Mother, and we affirm the trial court's order of termination as to Mother. We conclude the evidence is legally insufficient as to Father, and we reverse the order of termination as to Father.

At the outset of this appeal, we questioned whether we had jurisdiction over Mother's appeal.[1] As we requested, Mother filed a letter brief regarding jurisdiction, and we must now determine whether we have jurisdiction over Mother's appeal before we can proceed. The following undisputed facts are germane to this determination. The termination hearing concluded on May 6, 2020, with the trial court finding Mother's parental rights should be terminated. Mother was not present at the hearing, but was represented by trial counsel. On May 14, the trial court entered an Order Appointing Appellate Counsel in which it stated it found Mother's parental rights should be terminated and Mother is entitled to appellate counsel to conduct the appeal; the order appointed Toby Wilkinson as that counsel. The trial court did not send a copy of that order to Wilkinson, and there is no indication in the record that the order was sent to Mother. It is uncontested that Wilkinson became aware of his appointment only when he received an email from the official court reporter on July 8, 2020, in connection with the filing of the reporter's record with this Court. He then discovered the trial court had entered its order of termination on June 2. On July 9, he filed a formal notice of appeal and motion for extension of time to file on behalf of Mother. Wilkinson concedes Mother's motion for extension of time was not timely filed but urges, given the lack of notice of his appointment,

---

[1] Jurisdiction over Father's appeal is not in question.

application of the rules governing accelerated appeals violates Mother's due process rights. Given the unique nature of this proceeding, the elevated interests involved, and that the delay is entirely a product of state action, we conclude that it does.

In this case, the State, through the Texas Department of Family and Protective Services (Department), sought to terminate Mother's parental rights, and the judge, also acting as an agent of the State, concluded that her rights should be terminated, and appointed counsel to represent Mother on appeal. However, the court did not notify the attorney charged with representing Mother's interests on appeal of the appointment. The attorney was, thus, not afforded any opportunity to timely file a notice of appeal or a timely motion for extension of time to file the notice. *See* TEX. R. APP. P. 28.4 (appeals in parental termination cases are governed by rules of appellate procedure for accelerated appeals), 26.1(b) (notice of appeal in accelerated appeal must be filed within 20 days after the judgment or order is signed).

A notice of appeal is to be filed in the trial court, not this Court. *See* TEX. R. APP. P. 25.1(a). The notice of appeal apprises the trial court and the opposing party that the party suffering an adverse judgment intends to appeal and sets the appellate process in motion. *See generally* TEX. R. APP. P. 25.1, 31.1. In the context of parental termination, subject to a statutory obligation to appoint counsel to pursue an appeal, one might wonder what further purpose the separate notice from appointed counsel achieves. While an order appointing counsel for a possible appeal standing alone does not absolve counsel who has notice of his appointment of his

–3–

obligation to file the necessary notice of appeal, we would be inclined to find that, when the trial court fails to give notice of the appointment to the very person charged with timely filing it, the order of appointment has not served every legitimate interest underlying the requirement of filing a notice of appeal. Accordingly, under the circumstances presented here, it might be argued that the appointment either served as the notice of appeal or that the failure to serve notice to counsel operated as a functional denial of notice of the judgment to the party, implicating Texas Rule of Civil Procedure 306a(4).[2]

Parental rights are "far more precious than any property right," and when the State initiates a termination proceeding, "it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982). The involuntary termination of parental rights involves fundamental constitutional rights. *See, e.g.*, *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re G.M.*, 596 S.W.2d 846 (Tex. 1980). As such, our constitution and statutes provide for one level of appeal as a matter of right in termination cases. *See In re T.V.*, 8 S.W.3d 448, 449 (Tex. App.—Waco 1999, no pet.). As we have previously noted, the accelerated deadline to file a notice of appeal in parental termination cases is a

---

[2] While a notice to a party of a judgment in an ordinary case suffices to trigger the relevant appellate periods, this is not an ordinary case. The State is engaged with a litigant whom it contends is manifestly unable to manage her affairs. In a typical case, we would fairly assume that litigants are communicating with their counsel to confirm timely management of deadlines and tracking developments in their cases. In this case, however, there is no indication Mother was notified of the appointment and, had she been notified, she would likely presume the lawyer was also notified and acting accordingly.

"trap for the unwary." *In re R.J.S.*, 219 S.W.3d 623, 627 (Tex. App.—Dallas 2007, pet. denied). Because of the accelerated nature of these cases, trial courts must act expeditiously when appointing new counsel for the appeal. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). In doing so, it is imperative that the court notify court appointed counsel of the appointment. Failure to do so creates the risk, realized in this case, that counsel will not have the ability under our rules to timely file the notice of appeal. Worse still, where the parent is informed of the appointment, or even where the parent is merely deemed to be on notice of it, the appointment order would affirmatively discourage the parent from pursuing a timely pro se appeal or retaining separate counsel.

While the Department, the parent, and the child all share an interest in a quick and final decision, finality cannot trump a parent's constitutional right to be heard, including by appeal where the right to appeal exists. *Stanley v. Illinois*, 405 U.S. 645, 646 (1972); *In re M.S.*, 115 S.W.3d 534, 548 (Tex. 2003); *see also In re B.G.*, 317 S.W.3d 250, 258 (Tex. 2010) (failure to file requisite statement of appellate points could not, consistent with due process, form a basis for denying parent appellate record and concluding family code section 263.405 was unconstitutional as applied to parent); *In re J.O.A.*, 283 S.W.3d at 339, 347 (despite parents' failure to file timely statement of appellate points, due process required they be allowed to appeal; "section 263.405(i) is unconstitutional as applied when it precludes a parent from raising a meritorious complaint about the insufficiency of the evidence

supporting the termination order"). We likewise conclude that application of the rules concerning perfection of Mother's appeal is unconstitutional as applied here.

To be clear, this case does not involve private litigants bungling deadlines in a contest implicating their respective property rights. Here, the State sought to terminate Mother's parental rights and then obtained a judgment doing just that. This case involves a fundamental liberty interest with heightened procedural protections. Mother is indigent; thus, the trial court was required to (and did) appoint counsel to represent her. *See* TEX. FAM. CODE. ANN. § 107.301(a)(1). The statutory right to appointed counsel gives rise to constitutional considerations of due process in the administration of that right. *In re S.K.S.*, 236 S.W.3d 875, 891 (Tex. App.—Texarkana 2007, pet. denied). And yet, the trial court, another State actor, failed to give notice of the appointment of counsel. In effect, the trial court failed to provide Mother with counsel, as mandated by statute, and foreclosed her right to appeal within the rules. Accordingly, we conclude that section 263.405 of the family code (acceleration of appeals of termination orders) and the appellate rules concerning the perfection of appeals, as applied in this particular case with respect to Mother, are unconstitutional and do not preclude this Court from considering Mother's appeal. *See, e.g.*, *In re E.R.*, 385 S.W.3d 552, 562, 567 (Tex. 2012) (due process prevails over state law time limit).

## FACTUAL BACKGROUND

D.P.G. was born on August 9, 2019. He was removed from his parents' care shortly thereafter and placed into foster care based on a report that Mother had abused methamphetamine and marijuana throughout her pregnancy. D.P.G. also tested positive for amphetamines. Mother and Father met with a Department caseworker on August 15, 2019, to discuss a possible family placement for D.P.G. The maternal grandparents and a paternal aunt were identified as possible placements, but neither could care for D.P.G. D.P.G. was placed in foster care.

On August 16, the Department filed an Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent–Child Relationship, seeking, among other things, to immediately be named the sole managing conservator of D.P.G. Mother was served with the petition, but Father was not.

Early in the case, the Department prepared a family service plan for Mother to address the issues that led to D.P.G.'s removal and to move toward the goal of reunification. Mother provided input about which services to include in the plan, and she specifically believed she needed psychiatric services because she struggled with mental health. The Department did not prepare a family service plan for Father.

The trial court held an adversary hearing on August 22. The appellate record does not contain a transcript of that hearing. The temporary order entered following the hearing indicates Mother and Father appeared at that hearing, both unrepresented

–7–

by counsel. At that hearing, the trial court ordered Mother to (1) submit to drug and alcohol dependency assessments, (2) participate in psychosocial evaluation and counseling, (3) attend parenting classes, (4) submit to drug testing, (5) abstain from using drugs, (6) attend Narcotics Anonymous/Alcoholics Anonymous (NA/AA) meetings three times a week, (7) maintain stable housing and income, and (8) comply with each requirement set out in the Department's service plan, which included attending Intensive Outpatient Program/Supportive Outpatient Program (IOP/SOP) classes. According to testimony at trial, Father was offered services at the hearing but stated he wanted to wait to begin services until genetic testing confirmed paternity; Father was advised that waiting to start services could impact his ability to get D.P.G. back or timely complete his services. The trial court subsequently ordered Father undergo genetic testing to determine his parentage.

At the adversary hearing, the court ordered Mother and Father to complete drug testing that day. Mother tested positive for methamphetamines and marijuana, but Father did not complete testing. After the adversary hearing, Mother and Father told the Department they were living in a motel.

A status hearing was conducted on October 15, 2019. The appellate record does not contain a transcript of that hearing. Father appeared at that hearing without counsel, and Mother did not appear. The order from the status hearing states visitation for Mother and Father was suspended until each submitted two random urine analyses separated by two weeks and those analyses were clean.

On January 9, 2020, the trial court held a permanency hearing, and a transcript from the hearing is in the record. Mother was incarcerated and did not attend the hearing. Father also was incarcerated but attended the hearing without counsel. The Department did not know when Father would be released. The Department asked the court to order the following services for Father: (1) complete a substance abuse assessment, (2) attend NA/AA meetings, (3) attend IOP/SOP classes, (4) submit to a psychosocial evaluation, and (5) attend counseling and parenting classes. The court did so. However, at the hearing, a Department supervisor testified that Father would not be able to complete many of those services while incarcerated. When asked which services Father could complete, the supervisor did not know and stated he would need to talk to his colleague so she could contact the facility and determine which services were offered. The supervisor also testified the trial court previously had not ordered services for Father because Father requested DNA testing.

At the hearing, the court instructed Father that his rights could be terminated if he did not complete his services; Father acknowledged he understood. Father stated he did not have any objection to the services being ordered. Father told the trial court he planned to attend narcotics anonymous and take parenting and drug classes through the Salvation Army after he was released. He stated he wanted the trial court to know "I'll do whatever it takes to get my son."

At the permanency hearing, the Department advised it was seeking to terminate Mother's and Father's parental rights.[3] Accordingly, the trial court appointed trial counsel to represent Mother and Father individually.

On January 23, the trial court entered an order adjudicating Father as the biological parent of D.P.G.

A bench trial took place by video conference on April 29 and May 6. Mother and Father appeared solely through their trial counsel. The trial court heard testimony from Amber Davidson (Department caseworker), Larry Barksdale (Department supervisor), and Maria Yanez (Court Appointed Special Advocates (CASA) advocate).

### A.    Testimony from Amber Davidson

Davidson was the original caseworker assigned to this matter. She learned that Mother has two children in addition to D.P.G, but neither lives with her. Davidson initially tried to place D.P.G. with the maternal grandparents and a paternal aunt, but they were unable to care for an infant. Davidson inquired whether there were other relatives with whom D.P.G. could be placed, but no other names were provided.

Davidson testified that, at the adversary hearing in August 2019, Mother and Father told her they were living in a motel, and Father admitted to marijuana use.

---

[3] Before this point, the record does not indicate Father was served or otherwise advised of any effort to terminate his rights. Rather, as noted, Father appeared interested in establishing paternity.

This is the only statement Father made to the Department about drug use. Father was sent for drug testing twice. He did not appear the first time, but, in October 2019 when he was incarcerated, a hair follicle was collected for testing. The results of the hair follicle test are not in the record. The Department considers the failure to appear for a drug test to be a positive drug test. Davidson testified that Father did not refuse to take any drug test that the Department requested while he was incarcerated.

Davidson met Mother and Father on August 28. At that meeting, Mother admitted she uses methamphetamine and marijuana and she struggled with addiction throughout the last couple of years. Also in that meeting, Davidson gave Mother and Father her contact information, including her phone number and email address.

Davidson met with Mother and Father during their sole visitation with D.P.G. on September 3, 2019. Davidson recalled Mother and Father argued about whether Father was D.P.G.'s biological father. Another visitation was scheduled for September 23, but neither parent attended. According to Davidson, neither parent made any attempt to see D.P.G. after September 3, and, during the pendency of the case, they did not send any cards, letters, gifts, or anything else to indicate they wanted to maintain a relationship with the child.

Davidson's contact with Mother has been limited. At the beginning of the case, Davidson was in contact with Mother via phone and text message, and she saw Mother in person on September 3. Davidson last communicated with Mother on

September 12 when Mother texted her new apartment address and phone number. Davidson believed Mother and Father lived in the apartment, and Davidson attempted to see that apartment on September 17 and 24, but she was not able to obtain access to the apartment. Davidson did not advise Mother and Father about her plan to visit their apartment before doing so. Davidson texted Mother on September 23 using the same phone number as Mother had used on September 12, but Mother did not respond. Davidson did not attempt to contact Mother directly again.

Thereafter, Davidson attempted to contact Mother through the maternal grandmother without success. Davidson contacted the maternal grandmother in October, November, and December 2019 attempting to obtain new contact information for Mother, but she never obtained any contact information through the grandmother. Davidson was not aware of any other family member from whom she could try to obtain contact information to locate Mother.

Although the service plan was developed with Mother's input and was filed on October 2, 2019, Davidson did not provide a copy to Mother. Mother failed to complete a drug and alcohol assessment, a psychosocial evaluation, individual counseling, or the requisite parenting classes; did not attend any sessions for NA/AA; did not participate in IOP/SOP classes; and did not maintain stable income and housing. Mother completed the initial random drug testing but failed to submit to subsequent testing.

At some points during the pendency of this case, Mother was incarcerated in Dallas County and Hunt County, but Davidson did not attempt to see Mother while she was incarcerated. Davidson did not investigate whether services were available to Mother in either detention facility. Davidson believed Mother was released from the Hunt County jail in March 2020, but, at the time of trial, Davidson had not had contact with her and did not know where Mother was located. Davidson attempted to look for Mother in jail even after Davidson believed Mother was released. If Davidson had located Mother, she would have provided Mother's location information to Mother's counsel and the court so Mother could participate in the trial.

Father was incarcerated at the time of the January 9, 2020 permanency hearing and indicated that he believed he would be released in a couple of weeks. On the first day of trial, Davidson testified she thought Father had been released from incarceration, but she did not know. At the time of trial, she did not know Father's location. Davidson looked for Father, including at the jail where she believed he had been detained, but she could not locate him. She had not attempted to contact Father since his release, and he had not contacted her. Davidson never told Father he needed to contact her when he was released from incarceration. The last time Davidson attempted to contact Father by calling his cell phone number was in September 2019.

Davidson confirmed the Department did not prepare a family service plan for Father. Davidson was not aware of any signed order requiring Father to complete the services the Department requested on January 9, 2020. Davidson did not believe Father had worked any services since he was determined to be D.P.G.'s biological father.

The Hunt County jail is a few blocks from Davidson's office, but Davidson did not contact the Hunt County jail to determine what services would be available to Father. When asked why she did not do so, she responded: "There's no reason I did not - - I didn't contact the jail to find out" if services were available. When asked: "So a plan could have been prepared and it could have been reviewed with [Father] and he could have signed and been given one [while incarcerated]," Davidson confirmed that was correct.

Davidson testified D.P.G. was thriving in his foster placement. He was developmentally on target and well bonded with the foster family. The foster parents were interested in adopting D.P.G. Davidson expressed her belief that it was in the best interest of D.P.G. to terminate Mother's and Father's parental rights because they had not attempted to complete the court ordered services, did not have a stable home, and could not take care of themselves.

**B.      Testimony of Larry Barksdale**

Barksdale, a CPS supervisor, attended the permanency hearing on January 9, 2020, and he testified about the hearing at trial. Father attended the hearing wearing

–14–

clothing provided by the Hunt County detention center. After the Department provided the Court with results from the genetic testing showing Father was D.P.G.'s biological father, the court ordered Father to complete various services. However, no written order listing those services was provided to Father, and shackles precluded him from taking notes at the hearing. Father did not request a copy of an order from the Department.

At the January 9 hearing, Father indicated he believed he would be released from jail in one to two weeks, but, at the time of trial, Barksdale did not know whether Father had been released. Barksdale testified that if Father was released one to two weeks later, Father would have had time to complete the services before trial because Barksdale believed it is possible for a parent to complete services in a 90-day timeframe.

Barksdale testified at trial that the Department, in cooperation with a parent, arranges the services, and the Department would not arrange services if the Department was not in contact with the parent. Whether services are available while a person is incarcerated is dependent upon the facility and availability of providers at that facility. While some of the services Mother and Father were ordered to complete could have been completed while incarcerated, Barksdale did not know whether the Department arranged for those services for either of them while they were incarcerated. The Department tailors the services to meet the needs of the child, and not to meet the needs of the parent and, thus, does not consider whether

an incarcerated parent is able to complete the services. Barksdale initially testified the Department does not have a different service plan for parents who are incarcerated, but he later agreed the Department's manual has a specific section related to managing a situation when a parent is incarcerated and a service plan is needed. Barksdale has worked for the Department for eleven years and has never made a service plan or a recommendation for services for an incarcerated parent pursuant to the Department's policy.

Barksdale testified that parents are required to keep in contact with the Department, and Mother and Father each failed to do so.

Barksdale was asked where D.P.G. would go if the court decided not to terminate parental rights and instead ordered D.P.G. returned to either parent, and he replied the Department did not know where the parents were located. "[I]t would be next to impossible" to comply with that order.

### C. Testimony of Maria Yanez

Yanez, a CASA volunteer, attempted to observe a visit between Mother and D.P.G. at the end of September 2019, but Mother failed to attend. Yanez expressed her belief Mother and Father cannot meet D.P.G.'s physical and emotional needs due to their drug use. She received no indication that Mother and Father have a stable home, and she was unable to find an address for them.

Yanez was able to observe D.P.G. with his foster family. Yanez described D.P.G. as being a happy baby and indicated that he and the other children in the

home were "engage[d] as a normal family."  Yanez confirmed that she had not received any cards, letters, gifts, or anything that would indicate Mother and Father wanted to continue a relationship with D.P.G.  Like Davidson, Yanez expressed her belief that it was in the best interest of D.P.G. to terminate Mother's and Father's parental rights.  She confirmed the foster parents are motivated to adopt D.P.G. and stated the foster family members are the only faces D.P.G. has consistently seen since his birth.

Yanez never had a conversation with Father, she had not been to his residence, and she did not know where he lived.  Yanez did not meet Mother.

### D.    Trial Court's Findings

At the conclusion of the trial on the merits, the trial court found Mother and Father had constructively abandoned D.P.G. Further, while the Department made reasonable efforts to return the child to Mother and Father, Mother and Father had not regularly visited or maintained significant contact with D.P.G., and Mother and Father had demonstrated an inability to provide D.P.G. with a safe environment.  *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(N).  The court further found that termination of the parent–child relationship between Mother and Father and D.P.G. to be in the best interest of D.P.G.  *See id.* § 161.001(b)(2).  On June 2, 2020, the trial court entered its order terminating Mother's and Father's parental rights to D.P.G. and appointing the Department as Permanent Managing Conservator of D.P.G.  This appeal followed.

–17–

Mother and Father appeal the trial court's order terminating their respective parental rights to D.P.G.[4] They both challenge the legal and factual sufficiency of the evidence to support the trial court's finding they constructively abandoned D.P.G. as the predicate ground for termination of their parental rights. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(N). Mother and Father do not challenge the trial court's finding that termination of their parental rights is in the best interest of D.P.G.

The involuntary termination of parental rights involves fundamental constitutional rights. *In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980). The Supreme Court has stated that a natural parent's desire for—and his right to—the companionship, care, custody, and management of his child is an interest "far more precious than any property right." *Santosky*, 455 U.S. at 758–59. Termination of a parent's rights to a child is "traumatic, permanent, and irrevocable." *In re M.S.*, 115 S.W.3d 534, 549 (Tex. 2003). For these reasons, the Texas Family Code and the Due Process Clause of the United States Constitution require that grounds for termination of parental rights be proved by clear and convincing evidence. TEX. FAM. CODE ANN. § 161.001; *Santosky*, 455 U.S. at 753–54. To apply the clear and convincing evidence standard of proof in parental termination cases, we consider whether the proof is such that a reasonable factfinder could have formed a firm belief

---

[4] Mother and Father filed separate appeals.

–18–

or conviction about the truth of the allegations. *In re J.F.C.*, 96 S.W.3d 256, 263–64 (Tex. 2002). We strictly construe involuntary termination statutes in favor of the parent. *In re E.R.*, 385 S.W.3d at 563.

The Texas Supreme Court has held that the heightened burden of proof in parental termination cases gives rise to a concomitantly heightened standard of appellate review. *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020) (citing *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019)). Under the legal sufficiency standard of review for a finding based on clear and convincing evidence, "a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). Although "the trier of fact may draw inferences," those inferences must be "reasonable and logical ones." *Id.* (quoting *In re E.N.C.*, 384 S.W.3d 796, 804 (Tex. 2012)). Under this standard of review, "looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). To that end, a reviewing court "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). That "does not mean that a court must disregard all evidence that does not support the finding," as doing so "could skew the analysis of whether there is clear and convincing evidence." *Id.* (quoting *In re*

–19–

*J.F.C.*, 96 S.W.3d at 266). If, after conducting this review, an appellate court "determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266).

Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding. *Id.* Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true. *Id.*

For a trial court to terminate a parent's right to his child, the State must prove by clear and convincing evidence that the parent committed an act prohibited under the family code's section 161.001(b)(1) and that termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(b)(1), (2). In this case, the trial court, as the factfinder, concluded Mother and Father constructively abandoned D.P.G., a predicate ground for termination under section 161.001(b)(1) of the family code. *See id.* § 161.001(b)(1)(N). To establish constructive abandonment, the Department had to prove the child has been in the permanent or temporary managing conservatorship of the Department for not less than six months; and (i) the

–20–

Department has made reasonable efforts to return the child to the parent; (ii) the parent has not regularly visited or maintained significant contact with the child; and (iii) the parent has demonstrated an inability to provide the child with a safe environment. *Id.* The first element focuses on the Department's conduct; the second and third elements focus on the parent's conduct. *In re X.A.S.*, No. 05-19-01082-CV, 2020 WL 1042520, at *3 (Tex. App.—Dallas Mar. 3, 2020, no pet.) (mem. op.).

### A. Mother's Appeal

Mother does not dispute that D.P.G. was in the Department's care for more than six months, the Department made reasonable efforts to return D.P.G. to her, and she did not regularly visit or maintain significant contact with D.P.G. She challenges the trial court's finding concerning the final element only, that she demonstrated an inability to provide D.P.G. with a safe environment. In doing so, Mother claims the Department was required to conduct a social study of her home to determine whether she could provide D.P.G. with a safe environment and the Department could have conducted such a study because it always knew where Mother resided.

As an initial matter, we note the record establishes the Department frequently did not know Mother's whereabouts, and Mother failed to maintain contact with the Department to make a home study possible. In addition, Mother fails to support her argument that the Department had a duty to conduct a home study with any legal authority and ignores the fact that the safe environment determination encompasses a multitude of factors, several of which support the trial court's finding she has

–21–

demonstrated an inability to provide D.P.G. with a safe environment. *See In re N.A.V.*, No. 04-19-00646-CV, 2020 WL 1250830, at \*6 (Tex. App.—San Antonio Mar. 17, 2020, pet. denied) (mem. op.). Those factors include the child's age and physical and mental vulnerabilities; Mother's willingness and ability to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; Mother's willingness and ability to effect positive environmental and personal changes within a reasonable period of time; and whether Mother demonstrates adequate parenting skills. *See In re M.R.J.M.*, 280 S.W.3d 494, 506 (Tex. App.—Fort Worth 2009, no pet.).

The trial court heard evidence D.P.G. came into the care of the Department days after his birth due to allegations of substance abuse. Mother admitted having used methamphetamine and marijuana throughout her pregnancy and she knew the drugs were harmful to the child. At birth, D.P.G. tested positive for drugs. At the time of trial, D.P.G. was less than a year old and in need of constant care and attention. A service plan was put into place, with Mother's input, for Mother to foster reunification. Early in the case, Mother was ordered to complete drug and alcohol assessments, to submit to a psychosocial evaluation and individual counseling, to complete parenting classes, to attend NA/AA or Celebrate Recovery three times a week, to maintain stable income and housing, and to submit to random drug testing. Mother did not complete any of the required services, other than submitting to the initial drug testing, which was positive for methamphetamine and

–22–

marijuana. After September 2019, Mother did not maintain contact with the Department and did not provide the Department with information about her living or employment circumstances. Mother also did not arrange for another appropriate person to care for D.P.G.

Viewing the evidence in the light most favorable to the trial court's finding, we conclude the court could have formed a firm belief or conviction that the Department proved Mother demonstrated an inability to provide D.P.G. with a safe environment. *See, e.g.*, *In re G.P.*, 503 S.W.3d 531, 534 (Tex. App.—Waco 2016, pet. denied) (evidence legally and factually sufficient to show mother's failure to provide safe environment where mother failed to provide Department with any information about her living or employment circumstances, failed to make child support payments, failed to seek out and accept counseling services, refused to take required drug tests, and failed to even maintain contact with her child); *In re J.J.O.*, 131 S.W.3d 618, 630 (Tex. App.—Fort Worth 2004, no pet.) (evidence legally and factually sufficient to show mother had demonstrated inability to provide her child with safe environment when mother failed a drug test, attended only half of her parenting classes, and did not complete a psychological evaluation or participate in counseling). Likewise, considering all evidence in the record, we conclude the evidence is such that a factfinder could reasonably form a firm conviction about the truth of the allegations against Mother. *See In re G.P.*, 503 S.W.3d at 534; *In re J.J.O.*, 131 S.W.3d at 630. Because the evidence is legally and factually sufficient

to support the trial court's finding on Mother's inability to provide a safe environment for D.P.G., we overrule Mother's sole issue.

### B. Father's Appeal

Father also does not dispute that D.P.G. was in the Department's care for more than six months, and he did not regularly visit or maintain significant contact with D.P.G. Father argues the evidence is legally and factually insufficient to support the trial court's findings that the Department made reasonable efforts to return D.P.G. to him, and he demonstrated an inability to provide D.P.G. with a safe environment. Because we conclude the evidence is legally insufficient to show the Department made reasonable efforts to return D.P.G. to Father, we do not consider whether Father demonstrated an inability to provide D.P.G. with a safe environment. *See* TEX. R. APP. P. 47.1.

When considering whether the Department made reasonable efforts to return the child to the parent, we focus on the Department's conduct rather than the parent's conduct, and the relevant inquiry is whether the Department made reasonable efforts, not ideal efforts. *In re X.A.S.*, 2020 WL 1042520, at \*3 (citing *In re F.E.N.*, 542 S.W.3d 752, 766–67 (Tex. App.—Houston [14th Dist.] 2018, pet. denied)). "Returning the child to the parent, per section 161.001(1)(N)(i), does not necessarily mean that the child has to be physically delivered" to the parent. *In re F.L.B.*, No. 13-19-00319-CV, 2019 WL 6606159, at \*7 (Tex. App.—Corpus Christi-Edinburg

Dec. 5, 2019, no pet.) (mem. op.) (quoting *In re D.S.A.*, 113 S.W.3d 567, 573 (Tex. App.—Amarillo 2003, no pet.)).

Generally, the Department's implementation of a family services plan is considered a reasonable effort to return a child to the parent if the parent has been given a reasonable opportunity to comply with the terms of the plan. *In re X.A.S.*, 2020 WL 1042520, at *3 (citing *In re A.L.H.*, 468 S.W.3d 738, 744 (Tex. App.— Houston [14th Dist.] 2015, no pet.)). In this case, the Department did not prepare a family service plan for Father, presumably because his paternity was not established until January 2020. But this does not end our inquiry; we next consider whether the record reflects the Department made reasonable efforts to return D.P.G. in spite of the absence of a family service plan. *See In re F.E.N.*, 542 S.W.3d at 766.

The undisputed evidence shows the Department tried to return D.P.G. by placing him with relatives. The Department was unsuccessful in its effort because the relatives declined to take the baby, and the names of additional relatives were not provided. *See In re K.J.T.M.*, No. 06-09-00104-CV, 2010 WL 1664027, at *3- 4 (Tex. App.—Texarkana Apr. 26, 2010, no pet.) (mem. op.) (considering Department's futile efforts to place child with relatives when determining whether Department made reasonable efforts under subsection (N)). The Department made D.P.G. available for visitation on September 3 and 23, but Father attended only on September 3. The Department offered services to Father at the adversary hearing, but Father refused to complete them until paternity was determined. Davidson

–25–

provided her contact information to Father but did not inform Father that he needed to contact her when he was released from incarceration. Davidson testified she made some effort to determine whether Father remained incarcerated after January 2020.[5]

Davidson testified the last time she attempted to contact Father was in September 2019; she did not contact Father's family in an attempt to obtain information about Father. Davidson did not attempt to communicate with or visit Father while he was incarcerated, despite knowing he was in the Hunt County jail, which was only a few blocks from her office.

The Department knew Father was incarcerated when the trial court ordered services for him on January 9, 2020, because he was wearing clothing provided by the Hunt County detention center and he was shackled at the hearing. Barksdale testified he did not know which services Father could complete while incarcerated, but he would ask Davidson to contact the facility and determine what was offered. However, the Department did not contact the Hunt County jail to determine what services, if any, were available to Father while he was incarcerated. Further, the Department did not attempt to implement its own policies related to incarcerated parents.

---

[5] Although the evidence shows Mother provided an apartment address to Davidson and Davidson made unscheduled visits on September 17 and 24, 2019, the record does not indicate whether Father also lived in this apartment. Some evidence shows Mother and Father were not living together in September 2019. Davidson testified she did not attempt to visit Father at any other address, including an address she believed was current on August 26, 2019.

Additionally, although the Department knew Father was shackled at the permanency hearing and could not write down the court-ordered services himself, the Department made no effort to provide a list of those services to Father. The record does not reflect whether Father understood the services assigned to him. *See In re D.G.*, No. 02-17-00332-CV, 2018 WL 547787, at *2 (Tex. App.—Fort Worth Jan. 25, 2018, no pet.) (mem. op.) (trial court's order incorporating service plan did not show Father reviewed, understood, or signed the service plan).

Trial began approximately ninety days after the trial court signed the adjudication of parentage on January 23, 2020, and no evidence was presented at trial as to whether Father was incarcerated between January 23 and April 29, 2020 when trial began. During that time, the Department made no efforts to contact Father, provide a list of the services ordered by the trial court, or help him find places to complete the services after his release. *See In re A.Q.W.*, 395 S.W.3d 285, 290 (Tex. App.—San Antonio 2013, no pet.) (evidence of reasonable efforts insufficient where the "record contains no evidence that appellant was provided with a reasonable opportunity to enroll in, much less complete, any of the requirements that he could have complied with while incarcerated"), *overruled on other grounds by In re J.M.T.*, 617 S.W.3d 604 (Tex. App.—San Antonio 2020, no pet.). In so far as Father did not perform any services before January 2020, "the Department cannot use the failure of an alleged father . . . to voluntarily perform services prior to adjudication [of paternity] to show it made a reasonable effort to return the child

under subsection N." *In re J.W.*, 615 S.W.3d 453, 473 (Tex. App.—Texarkana 2020, no pet.).

We agree with the trial court that the Department made some efforts to return D.P.G. to Father, including attempting to place D.P.G. with family members. However, mindful of the elevated burdens in a parental termination case as well as the heightened evidentiary standard, we conclude the trial court could not have reasonably formed a firm conviction or belief that the Department put on clear and convincing evidence that it made reasonable efforts to return D.P.G. to Father to support the first element of constructive abandonment. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(N)(i); *see also In re M.A.S.L.*, No. 04-18-00496-CV, 2018 WL 6624405, at *4 (Tex. App.—San Antonio Dec. 19, 2018, no pet.) (mem. op.) (evidence legally and factually insufficient to support finding under subsection (N) because no caseworker met with Father to discuss service plan and no evidence Father received the plan while incarcerated); *In re D.G.*, 2018 WL 547787, at *5 (evidence legally insufficient to support finding under subsection (N) because Department had no proof Father received a copy of services plan and did not know whether he completed any services; although record shows caseworker offered to help Father locate services at outset of case, record contained no evidence she followed through or Department offered Father any services after he filed his answer); *In re D.N.*, 405 S.W.3d 863, 875 (Tex. App.—Amarillo 2013, no pet.) (evidence legally insufficient to support finding under subsection (N) because no

evidence existed that Department made efforts to provide mother with services); *In re A.Q.W.*, 395 S.W.3d at 290 (evidence legally insufficient to support finding that Department made reasonable efforts to return child to father where he did not receive service plan until thirty-four days before termination trial); *In re V.S.R.K.*, No. 02-08-047-CV, 2009 WL 736751, at *9 (Tex. App.—Fort Worth Mar. 19, 2009, no pet.) (mem. op.) (evidence legally insufficient to support finding under subsection (N) where Department failed to make efforts to meet with incarcerated parent, even when jail or prison is responsible).  Because the evidence is insufficient to support the first element of constructive abandonment, we conclude the evidence is legally insufficient to support the trial court's constructive-abandonment finding.

Having concluded the evidence is legally insufficient to support the trial court's constructive-abandonment finding, we need not address Father's factual sufficiency challenge to that finding.  *See* TEX. R. APP. P. 47.1.

### DEPARTMENT AS MANAGING CONSERVATOR

The Department requested conservatorship pursuant to family code section 153.131, and the trial court made the specific findings that the statute requires: that appointment of Father as D.P.G.'s managing conservator would not be in his best interest because it would significantly impair his physical health or emotional development, and that appointment of the Department was in D.P.G.'s best interest. TEX. FAM. CODE ANN. § 153.131. Father did not specifically appeal these findings or the conservatorship order.  Because appointment of the Department as managing

–29–

conservator under section 153.131 is a basis for appointment separate and apart from appointment solely as a consequence of a termination decree, separate challenges are required on appeal. *In re J.A.J.*, 243 S.W.3d 611, 613 (Tex. 2007). Accordingly, we do not disturb the trial court's order awarding the Department permanent managing conservatorship.

## CONCLUSION

We affirm the trial court's order terminating Mother's parental rights to D.P.G. Because we sustain Father's legal-sufficiency challenge to the trial court's affirmative finding under predicate ground N, we reverse the final order as to that finding and render judgment denying the Department's request for termination of Father's parental rights.

/Erin A. Nowell//
ERIN A. NOWELL
200652f.p05                                    JUSTICE

Schenck, J., concurring



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

IN THE INTEREST OF D.P.G., A CHILD

No. 05-20-00652-CV

On Appeal from the 196th Judicial District Court, Hunt County, Texas Trial Court Cause No. 87836. Opinion delivered by Justice Nowell. Justices Schenck and Molberg participating.

In accordance with this Court's opinion of this date, we **WITHDRAW** this Court's December 9, 2020 opinion, **VACATE** this Court's December 9, 2020 judgment, and **AFFIRM** the trial court's judgment in part and **REVERSE** the trial court's judgment in part.

We **AFFIRM** the trial court's order terminating Mother's parental rights to D.P.G.

We **REVERSE** the trial court's order terminating Father's parental rights to D.P.G. and render judgment denying the Texas Department of Family and Protective Services's request for termination of Father's parental rights.

Judgment entered this 17th day of June 2021.